John Ohlson, Esq.
NV BAR 1672
275 Hill Street, Suite 230
Reno, Nevada  89501
Telephone:  (775) 323-2700
Email:  John@OhlsonLaw.com
*Attorney for Plaintiff*
*Leslie J. Shaw*

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

LESLIE J. SHAW,

                Plaintiff,

vs.

CITIMORTGAGE, INC.; NORTHWEST
TRUSTEE SERVICES, INC.; BANK OF
NEW YORK AS TRUSTEE FOR SASCO
FUND 2003-37A; and DOES 1 through 10,
inclusive,

                Defendants.

_____/

Case No.  3:13-cv-00445-LRH-VPC

**PLAINTIFF'S SECOND AMENDED
AND SUPPLEMENTAL COMPLAINT
FOR INJUNCTIVE RELIEF AND
DAMAGES**

Plaintiff, LESLIE J. SHAW, by and through his attorney, John Ohlson, Esq., and by way of his second amended complaint, alleges and complains, as follows:

## JURISDICTIONAL ALLEGATIONS

1.      Plaintiff LESLIE J. SHAW ("Shaw") is, and at all relevant times was, the owner of real property located at 251 McFaul Court in Zephyr Cove, Douglas County, Nevada.

2.      At the time of the events initially giving rise to this complaint, Shaw lived in the home and was a resident of Zephyr Cove, Douglas County, Nevada.

3.      Shaw is currently a resident of Reno, Washoe County, Nevada.

4.      Defendant CITIMORTGAGE, INC. ("CitiMortgage") is, and at all relevant times was, a Delaware corporation registered to do business in Nevada.

1

5.     In relevant part and among other things, CitiMortgage extends and services mortgage loans with regard to residential property in Nevada.

6.     Defendant NORTHWEST TRUSTEE SERVICESS INC. ("Northwest") is a Washington Corporation registered to do business in Nevada.

7.     Northwest provides trustee services, including the noticing, processing and completion of residential foreclosure actions in, against, and with regard to residential property identified in, the State of Nevada.

8.     Defendant BANK OF NEW YORK AS TRUSTEE OF SASCO FUND 2003-37A ("Bank of New York") is, and at all relevant times was, a financial entity, serving as trustee, by virtue of the terms of a servicing agreement, by the trust laws of the State of New York and applicable provisions of the Internal Revenue Code.

9.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendant Does 1 to 10, inclusive, are unknown to Shaw, who therefore sues Defendant Does 1 to 10 by such fictitious names.  Shaw is informed and believes, and thereon alleges, that each of the Doe Defendants is legally responsible in some manner for the events and circumstances alleged in this complaint and legally and proximately caused injury and damages to Shaw.  Shaw will seek leave to amend this complaint to insert the true names and capacities of those Doe Defendants when they known to Shaw.

10.     At all times relevant to this action, the Defendants, and each of them, were the principals, employers, associates, co-venturers, agents and/or employees of one another and were acting within the purpose and scope of their agency and employment with the authorization and/or permission of their principal and/or employer.  Each Defendant has ratified and approved the acts of his agent and, at all material times, each of the Defendants

was responsible in some manner for the acts and conduct alleged in this Complaint.

## FACTUAL ALLEGATIONS

### *Shaw Built a Home and Obtained a Mortgage Loan.*

11.     In 2001, Shaw had a home built on property he owned at 251 McFaul Court in Zephyr Cove, Douglas County, Nevada ("the McFaul Court home").

12.     On October 8, 2003, after the home's construction was completed, Shaw obtained a residential loan from Lehman Brothers Bank ("the Lehman Brothers loan").

13.     The Lehman Brothers Loan was evidenced and secured by a Promissory Note and Deed of Trust in favor of Lehman Brothers Bank.

14.     At some point after the October 8, 2003, loan transaction between Lehman Brothers Bank and Shaw, Lehman Brothers Bank transferred, assigned, and/or otherwise conveyed Shaw's Promissory Note and Deed of Trust to the Bank of New York in its trust capacity.

15.     Shaw made timely payments on the Lehman Brothers loan to a servicer known as Aurora Loan Services, which was associated with, owned by, and/or a part of Lehman Brothers until approximately June 2005, at which time the loan servicer became CitiMortgage, Inc.

16.     After CitiMortgage became the servicer on Shaw's residential loan, Shaw continued to timely pay his required mortgage payments to CitiMortgage through the end of 2011.

### *Shaw and CitiMortgage Subsequently Entered into a Permanent Loan Modification Agreement.*

17.     In late 2010, Shaw applied with CitiMortgage for a residential loan modification.

18.     Shaw qualified for a trial modification period for February, March, and April 2011 ("the trial period").

19.     On May 6, 2011, after Shaw timely complied with all of CitiMortgage's requirements for the trial period, CitiMortgage sent Shaw a Permanent Loan Modification Agreement for Shaw's review and signature.

20.     The Permanent Loan Modification Agreement, which was prepared by CitiMortgage, amongst other things:

        a.  Changed a previously-variable interest rate mortgage with a minimum low interest rate of 2.25% per year to fixed and defined interest rates of 2% in year one, 3% in year two, 4% in year three, and 5% for the remaining nineteen years of the loan obligation;

        b.  Immediately reduced Shaw's loan payment from approximately $4,100 per month to approximately $3,200 per month, subject to an annual interest rate increase; and

        c.  Eliminated the assumability of Shaw's October 2003 loan.

21.     On May 18, 2011, Shaw timely executed and returned the written Loan Modification Agreement.

22.     Pursuant to the terms of the Permanent Loan Modification Agreement, the effective date of which was May 1, 2011, Shaw timely paid the monthly amounts due in May, June, and July 2011.

***CitiMortgage Abruptly and Unilaterally Disavowed and Repudiated the Permanent Loan Modification Agreement.***

23.     On or about July 18, 2011, Despite Shaw's compliance with and his timely payments made under the terms of the Permanent Loan Modification Agreement, CitiMortgage

4

unexpectedly sent Shaw written notice that:

      a.   Shaw's loan had been placed in delinquency status;

      b.   all payments made in 2011 had been "unbooked";

      c.   Shaw owed approximately $35,000 in payments to reinstate the currency of his Mortgage; and

      d.   Shaw would not be granted a loan modification unless he signed new and different loan modification documents, purportedly prepared by CitiMortgage employee Juan Mayorga, and return the new agreement by August 2, 2011.  (Notified by Phone)

    24.     The new and different loan modification documents had conflicting and significantly different loan modification terms, including:

      a.   confirmation by Shaw that he had no prior, binding, or enforceable loan modification agreement; and

      b.   a provision that stated that at any time CitiMortgage determined the new contract to be in error, Shaw would agree to sign new and different loan documents as would be presented to him by CitiMortgage.

    25.     In its demand that Shaw execute new and different loan modification documents, CitiMortgage stated that a new and different loan modification agreement was required due to erroneous balloon payment language in the previously executed Permanent Loan Modification Agreement.

    26.     Based on the existing Permanent Loan Modification Agreement he executed and returned to CitiMortgage on May 18, 2011, and because the new and different loan modification documents contained provisions that were in conflict with and different from the

Permanent Loan Modification Agreement, Shaw refused to sign and return the new and different loan modification documents.

27.     After CitiMortgage unbooked Shaw's payments, put his account into delinquency, and disavowed and repudiated its Permanent Loan Modification Agreement with Shaw, CitiMortgage began applying the monthly sum of approximately $4,100 (the monthly payment from the prior loan agreement) from Shaw's "unbooked" funds, and assessed an approximate $900 per month delinquency based upon Shaw's payment to CitiMortgage of the modified amount of approximately $3,200 per month.

28.     In response to CitiMortgage's unexpected reversal of the current and fully paid status of Shaw's account under the terms of the Permanent Loan Modification Agreement, Shaw attempted to address and resolve the matter with CitiMortgage.

29.     In late July 2011, Shaw first spoke with Christopher Gabbert, a member of CitiMortgage's Executive Response Unit.

***Shaw Received the Fully Executed Version of the May/June 2011 Permanent Loan Modification Agreement from CitiMortgage.***

30.     Soon thereafter, Shaw received an August 2, 2011, letter from CitiMortgage that enclosed a copy of the fully executed Permanent Loan Modification Agreement.

31.     The fully executed Permanent Loan Modification Agreement that CitiMortgage sent to Shaw contained the May 18, 2011, signature of Shaw and the June 30, 2011, signature of Larry Baumann, Vice President of CitiMortgage, whose signature was notarized and accompanied by CitiMortgage's corporate seal.

32.     The August 2, 2011, letter from CitiMortgage that accompanied the fully executed Permanent Loan Modification Agreement advised Shaw that there was nothing further he needed to do regarding his loan modification.

33.     In the meantime, Shaw's contact with Christopher Gabbert brought about the involvement of Dana Ross, CitiGroup's Assistant General Counsel.

34.     Dana Ross contacted Shaw in early August 2011, and spent about a month participating in Shaw's efforts to address CitiMortgage's July 2011 unilateral rescission of the fully executed Permanent Loan Modification Agreement.

35.     By the time Dana Ross became involved in the issues related to Shaw's account, CitiMortgage had reported Shaw's delinquent mortgage status to credit reporting agencies.

***CitiMortgage Validated the May/June 2011 Permanent Loan Modification Agreement Between Shaw and CitiMortgage.***

36.     On August 23, 2011, after she investigated Shaw's claims and his account, Dana Ross sent Shaw an email with an attachment that she identified as an explanation of steps being taken by CitiMortgage to resolve the issues on Shaw's account.

37.     According to Dana Ross:

a.  there was nothing legally deficient with the fully-executed May/June 2011 Permanent Loan Modification Agreement;

b.  all of the payments made by Shaw pursuant to that agreement were going to be rebooked; and

c.  CitiMortgage would accept continued payments from Shaw under the May/June 2011 Permanent Loan Modification Agreement;

d.  CitiMortgage would correct the adverse credit reporting it had improperly done upon rejection of the loan modification agreement.

38.     By December 2011, Christopher Gabbert left CitiMortgage and, with regard to Shaw's account, was replaced by Jennifer Butler, who was also a member of the Executive

Response Unit.

***CitiMortgage Again Unilaterally Disavowed and Repudiated its May/June 2011 Permanent Loan Modification Agreement with Shaw.***

39.     Almost immediately, and contrary to the representations of CitiMortgage by way of Dana Ross, Jennifer Butler took the position, both in writing and in telephone discussions with Shaw, that Shaw did not have a loan modification agreement with CitiMortgage and that Shaw would have to sign an different agreement with CitiMortgage to qualify for a loan modification.

40.     Between December 2011 and March 2012, Jennifer Butler sent Shaw correspondence and documents stating that the new loan modification contract CitiMortgage required Shaw to sign was the draft of the proposed loan modification agreement prepared by Juan Mayorga in June 2011 that imposed an August 2, 2011 deadline.

41.     According to Jennifer Butler, if Shaw did not sign and return the new and different loan modification agreement that, by its terms (the August 2, 2011, deadline), had expired more than seven months earlier, she would close Shaw's account, Shaw would not get a loan modification, and she would no longer respond to Shaw's telephone calls or emails. Butler further falsely told Plaintiff that all the aforesaid had been confirmed by CitiMortgage's legal and underwriting departments.

42.     Because Shaw believed that his May/June 2011 Permanent Loan Modification Agreement with CitiMortgage was valid and binding, Shaw did not sign and return the new and different loan modification agreement forwarded to him by Jennifer Butler.

43.     As a result of Shaw's refusal to sign and return the new and different loan modification agreement in favor of his valid and binding May/June 2011 Permanent Loan Modification Agreement, Jennifer Butler closed her file with respect to Shaw and refused to

respond to any further calls or emails from Shaw.

### *Shaw Requested Information About the Identity of the Loan's Investor(s).*

44.     Once Shaw received Dana Ross's August 2011 notification about the validity of his May/June 2011 Permanent Loan Modification Agreement, and because "investor regulations and delegations" were blamed for the wrongful disregard of his May/June 2011 Permanent Loan Modification Agreement, Shaw began requesting information about the identity of the lender, loan owner, or investor on his loan.

45.     Those requests were first directed to Christopher Gabbert and Dana Ross, and later, to Jennifer Butler.

46.     In a January 9, 2012, letter from CitiMortgage, and after months of emails and telephone calls to and from Christopher Gabbert, Dana Ross, and Jennifer Butler, CitiMortgage advised Shaw that the owner of his loan was Aurora Loan Services.

### *Shaw Discontinued his Payments to CitiMortgage.*

47.     By January 2012, in response to Jennifer Butler's demand and other inducements for a new and different loan modification agreement, Shaw ceased making monthly payments on his account to CitiMortgage.

48.     Based on Shaw's experience after making payments pursuant to the May/June 2011 Permanent Loan Modification Agreement, and given CitiMortgage's renewed efforts, via Jennifer Butler, to disavow and repudiate the May/June 2011 Permanent Loan Modification Agreement despite CitiMortgage's validation, via Dana Ross, of the May/June 2011 Permanent Loan Modification Agreement, Shaw was in a catch-22:

        a.   If Shaw continued to pay the modified monthly payment of $3,200, CitiMortgage would charge him $4,100 as an unmodified monthly payment,

assess an approximate $900 monthly delinquency, and claim Shaw's breach, just as it did in August 2011.

    b.  If Shaw did not make his mortgage payments, CitiMortgage would claim breach and delinquency.

49.    While Shaw continued to try to get the issues on his account addressed through Jennifer Butler, once she closed her file, there was little more Shaw could do.

***CitiMortgage Proposes a "Loan Reinstatement" Agreement in Reference to the Unsigned August 2011 Loan Modification Documents.***

50.    In or about May 2012, Robert Orcutt replaced Jennifer Butler on CitiMortgage's Executive Response Unit as it concerned Shaw's account.

51.    Between May and June 2012, which was the approximate duration of Robert Orcutt's involvement with Shaw, Robert Orcutt telephonically proposed to Shaw an account reinstatement agreement.

52.    Shaw requested that Robert Orcutt forward to him the proposed account reinstatement agreement in writing.

53.    In or about mid to late June 2012, Shaw received a proposed reinstatement agreement.

54.    That proposed reinstatement agreement simply stated that if Shaw paid all of the back-due monthly payments, CitiMortgage would waive interest and reinstate Shaw's account.

55.    The proposed reinstatement agreement, however did not designate the loan agreement – modified or otherwise, dated or undated – to which it referred.

56.    On or about June 26, 2012, Shaw called Robert Orcutt in inquire as to the date of the loan that he would be reinstating, to which Robert Orcutt responded "the one you are not

paying."

57.    When Shaw requested a more specific answer to his inquiry, Robert Orcutt identified the date of the modified loan agreement that would be reinstated as "August 2011."

58.    Because Shaw did not have a loan agreement with CitiMortgage dated August 2011 (that being the new and different loan agreement initially proposed by Juan Mayorga and then Jennifer Butler), Shaw advised Robert Orcutt accordingly and followed with an email confirming the same.

59.    During the interactions between Robert Orcutt and Shaw, Robert Orcutt tried to give Shaw contact information for Aurora Loan Services, the entity that had been previously been identified to Shaw as the potential lender, master servicer and/or loan owner on his account.

60.    The information about Aurora Loan Services provided by Robert Orcutt, however, was a non-functioning email and telephone number.

61.    When Shaw advised Robert Orcutt that the contact information for Aurora Loan Services was not current and invalid, Robert Orcutt had no other information to offer.

***CitiMortgage's Collection Efforts Made Shaw's Continued Occupancy of the McFaul Court Home Impossible.***

62.    After Shaw's communications with Robert Orcutt dissipated, Shaw received incessant collection notices from CitiMortgage.

63.    In response to each of CitiMortgage's collection notices, Shaw always, without exception, called whatever phone number CitiMortgage provided on its notices.

64.    Despite his repeated efforts to call the telephone numbers provided by CitiMortgage, Shaw had difficulty being able to speak to a person, and when he was able to speak with a customer service representative, rather than refer Shaw to the Executive Response

Unit, that representative would tell Shaw that he or she was unable to assist Shaw because his loan was in delinquency.

65.     As the summer of 2012 approached, Shaw, who was sill living in the McFaul Court home, continued to receive "door hangers," collection letters, and threatening emails from CitiMortgage, which made the peaceful occupancy by Shaw of the McFaul Court home impossible.

66.     As a result of CitiMortgage's aggressive collective efforts, Shaw relocated to Reno, Nevada in August 2012.

67.     Shaw has not lived in the McFaul Court home since August 2012, and the house has, except for a brief rental period, remained vacant.

68.     Notwithstanding his decision to move from the McFaul Court home, Shaw continued – and continues – his efforts assert, and to get CitiMortgage's recognition of, his rights under the May/June 2011 Permanent Loan Modification Agreement.

***CitiMortgage Initiated Foreclosure Proceedings.***

69.     In January 2013, Northwest Trustee Services, Inc., on behalf of CitiMortgage, initiated foreclosure proceedings against the McFaul Court home by recording a Notice of Default and Election to Sell, as well as an Affidavit of Compliance.

70.     Included in those documents was an address to which Shaw could write regarding any concerns, and on January 29, 2013, Shaw sent a multi-page letter to that address.

71.     In response to Shaw's January 29, 2013, letter, attorney Joseph Bleeker of RCO Legal in Henderson, Nevada advised Shaw that he was the attorney for both CitiMortgage and Northwest Trustee Services, that Shaw's letter would be treated as a "Qualified Written Request" under the Real Estate Settlement and Procedures Act, and that Shaw would have a

timely response to his letter.

72.     On March 6, 2013, Shaw received a response to his letter from Kristin Dennis, Default Research Specialist at CitiMortgage.

73.     In her response, Kristin Dennis stated that Shaw had been eligible for a loan modification, but that his account had been closed because Shaw failed and refused to sign and return loan modification documents.

74.     Shaw, in turn, forwarded to Joseph Bleeker the fully executed May/June 2011 Permanent Loan Modification Agreement.

75.     Joseph Bleeker neither responded to May/June 2011 Permanent Loan Modification Agreement provided by Shaw nor provided any other explanation of any kind.

76.     Soon thereafter, Northwest Trustee Services scheduled two concurrent dates – May 30, 2013, and June 5, 2013 – for the foreclosure of the McFaul Court home.

77.     Both dates were thereafter cancelled or postponed, and Joseph Bleeker send Shaw an email stating that he was advising his client not to reset the May 30/June 5 foreclosure dates until the questions presented in Shaw's January 29, 2013, letter could be answered and the issues set forth in that letter at least considered.

78.     Despite those representations from Joseph Bleeker, the foreclosure dates were rescheduled for August 9, 2013.

**_Shaw Filed his Complaint Against CitiMortgage._**

79.     On July 26, 2013, Shaw filed his complaint in this case in the Ninth Judicial District Court, in and for Douglas County, Nevada.

80.     Shaw sought to, among other things, stop the foreclosure by CitiMortgage of his McFaul Court Home and for other relief related to the May/June 2011 Permanent Loan

13

Modification Agreement.

81.     CitiMortgage removed Shaw's case to this Court.

82.     On August 2, 2013, prior to removing the case, CitiMortgage stipulated to, and the state district court issued, a preliminary injunction that prohibited CitiMortgage from pursuing foreclosure proceedings during the pendency of this action.

83.     That preliminary injunction has been in full force and effect since it was issued.

**CitiMortgage has Frustrated Shaw's Efforts Sell the McFaul Court Home.**

84.     After CitiMortgage recorded its Notice of Default and Election to Sell, and in an effort to race against the risk of losing his home to foreclosure, Shaw immediately began marketing the McFaul Court home as a short sale property, and initially listed the property at $750,000 ($250,000 less than the existing listing price).

85.     In February 2013, Shaw received an offer on the home for $857,000, and submitted that offer to CitiMortgage for approval.

86.     After Shaw submitted the offer to CitiMortgage, CitiMortgage employee Maria Mejia repeatedly and continually requested from Shaw and/or Shaw's realtor the same documents that had previously and repeatedly been provided to her.

87.     On May 15, 2013, after multiple extensions in favor of the buyers, the short sale was cancelled or terminated.

88.     At no time during the 90-day time period between when Shaw received the offer and when the short sale was terminated did CitiMortgage substantively respond to the offer with an approval or disapproval.

89.     After the May/June 2013 foreclosure date was rescheduled for August 9, 2013, Shaw again began racing the foreclosure clock by trying to sell the McFaul Court home before

the foreclosure date.

90.     Shaw revived the previous February 2013 short sale offer, and in August 2013, that offer was again presented to CitiMortgage.

91.     Again, Maria Mejia was the CitiMortgage account representative in reference to that offer.

92.     The same process that had occurred in February, March, April and May of 2013 with respect to the first short sale offer was repeated in August, September, and October of 2013 with respect to the second short sale offer.

93.     In November 2013, while the second short sale offer was still pending, attorney Colt B. Dodrill of Wolfe & Wyman LLP replaced Joseph Bleeker of RCO Legal as to CitiMortgage only.

94.     Colt Dodrill advised Shaw to submit the short sale communications directly to him rather than Maria Mejia.

95.     By mid-November, despite that Shaw submitted the short sale communications to Colt Dodrill as requested, there was no response to the offer by CitiMortgage through any of the representatives to whom the offer had been submitted, and the offer again expired.

96.     After CitiMortgage's change in counsel, and as Joseph Bleeker remained attorney of record for Defendant Northwest Trustee Service, Joseph Bleeker wrote an email to Shaw explaining that the August 9, 2013, foreclosure sale that was scheduled on the McFaul Court home was the result of a mistake by a new employee at Northwest Trustee Service.

97.     On November 23, 2013, Colt Dodrill advised Shaw that the investor on Shaw's account was "Bank of New York as Trustee for Structured Assets Security Corp. Mortgage Pass-Through Certificates 2003-37A" ("Bank of New York"), but did not, provide any contact

information for Bank of New York to Shaw.

98.     In December 2013, Colt Dodrill asked that Shaw again put the McFaul Court home back on the market.

99.     In compliance with Colt Dodrill's request, Shaw again listed the McFaul Court home, and listed it for sale at $1,082,000, which was the appraised value of the home according to CitiMortgage's April 2013 appraisal report.

100.    In an effort to maximize the value of the home, CitiMortgage agreed to, and did, cancel the January 2013 Notice of Default and Election to Sell that had been recorded against the McFaul Court home.

101.    In March 2014, Shaw received a new and different short sale offer for $785,000.

102.    Shaw presented the offer to CitiMortgage on April 14, 2014.

103.    Because one of the terms of the short sale offer was that CitiMortgage had to approve it within ten (10) business days, CitiMortgage was required to respond on or before April 28, 2014.

104.    CitiMortgage did not respond to the offer within the required ten (10) days, or at any time after that.

105.    During a late May 2014 case conference in this case, this Court required that CitiMortgage respond to the short sale offer, within 5 days, which had been extended to allow CitiMortgage to consider and respond to the offer.

106.    Despite that this Court required that CitiMortgage respond to the short sale offer within 5 days, CitiMortgage did not respond until the sixth day, and then refused the offer.

107.    A new short-sale offer in the sum of $825,000 was submitted to CitiMortgage

on July 14, 2014.  CitiMortgage never responded to that offer, and it expired by its own terms.

*CitiMortgage has Disregarded the Preliminary Injunction Prohibiting Further Foreclosure Efforts.*

108.  As recently as June 2014, while the short sale offer that was presented to CitiMortgage on April 14, 2014, was pending, and despite the that there is a preliminary injunction in this case preventing CitiMortgage from taking any further action to foreclose on the McFaul Court property while this case is pending, CitiMortgage sent Shaw written notice, purportedly in compliance with new laws governing the Consumer Finance Protection Board, that Shaw's "loan is in foreclosure" and "…that a first notice or refilling required by applicable law for judicial or non-judicial foreclosure has been made."

## FIRST CAUSE OF ACTION
### (Declaratory Relief – Bank of New York Transfer)

109.  The preceding paragraphs of this Complaint are alleged and incorporated by reference as if fully stated here.

110.  There is a substantial, actual, and continuing controversy between Shaw and Bank of New York as it concerns the conveyance, assignment, and/or transfer by Lehman Brothers Bank of Shaw's Promissory Note and Deed of Trust to Bank of New York.

111.  The servicing agreement, the trust laws of the State of New York under which the Bank of New York, it its trustee capacity, was allegedly formed, and the applicable provisions of the Internal Revenue Code required that the transfer, assignment, or conveyance by Lehman Brothers Bank of Shaw's October 8, 2003, Promissory Note and Deed of Trust to Bank of New York, in a trustee capacity, occur on or before the closing date of the trust, and in no event later than ninety days thereafter.

112.  The transfer, assignment, or conveyance of Shaw's October 8, 2003, Promissory Note and Deed of Trust by Lehman Brothers Bank to Bank of New York, in its

trustee capacity, did not occur by either the closing date of the trust of which Bank of New York was a trustee or within ninety days thereafter and, therefore, was not timely.

113.    The untimely transfer, assignment, and/or conveyance by Lehman Brothers Bank of Shaw's October 8, 2003 Promissory Note and Deed of Trust to Bank of New York, in its trustee capacity, renders that transfer, assignment, and/or conveyance void.

114.    Shaw requests a judicial declaration that, because the transfer, assignment, and/or conveyance by Lehman Brothers Bank of Shaw's October 8, 2003, Promissory Note and Deed of Trust to Bank of New York, in its trustee capacity, is void, the Bank of New York has no right, title, or interest in the McFaul Court home.

115.    A judicial declaration is necessary and proper at this time and under these circumstances so that the parties may determine their rights and duties with respect to the McFaul Court home.

**SECOND CAUSE OF ACTION**
**(Declaratory Relief – the May/June 2011 Permanent**
**Loan Modification Agreement)**

116.    The preceding paragraphs of this Complaint are alleged and incorporated by reference as if fully stated here.

117.    There is a substantial, actual, and continuing controversy between Shaw and CitiMortgage as it concerns the fully executed May/June 2011 Permanent Loan Modification Agreement.

118.    On May 18, 2011, after Shaw applied with CitiMortgage in late 2010 for a residential loan modification and timely complied with the requirements of the trial modification period in February, March, and April 2011, Shaw timely executed and returned the Permanent Loan Modification Agreement that had been sent to him by CitiMortgage, and

began making payments to CitiMortgage in accordance with its terms.

119.    On June 30, 2011, Larry Baumann, Vice President of CitiMortgage, also executed the Permanent Loan Modification Agreement on behalf of CitiMortgage.

120.    CitiMortgage forwarded a copy of the May/June 2011 fully executed Permanent Loan Modification Agreement to Shaw in August 2011.

121.    Shaw requests a judicial declaration by this Court that the fully executed May/June 2011 Permanent Loan Modification Agreement between CitiMortgage and Shaw is a valid and enforceable contract.

122.    A judicial declaration is necessary and proper at this time and under these circumstances so that the parties may determine their rights and duties under the May/June 2011 Permanent Loan Modification Agreement.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

123.    The preceding paragraphs of this Complaint are alleged and incorporated by reference as if fully stated here.

124.    CitiMortgage and Shaw are parties to a valid and enforceable Permanent Loan Modification Agreement that was fully executed, signed by Shaw on May 18, 2011, and by Larry Baumann, Vice President of CitiMortgage, on behalf of CitiMortgage on June 30, 2011.

125.    In order to qualify for and then in accordance with the terms and requirements of the Permanent Loan Modification Agreement, Shaw timely made payments in full from February 2011 through July 2011.

126.    On or about July 18, 2011, when Shaw was current and in full compliance with the parties' Permanent Loan Modification Agreement, CitiMortgage breached the fully-executed Permanent Loan Modification Agreement by:

a.   unilaterally, abruptly, and without notice of justification, reversing all payments made by Shaw February 2011 through July 2011;

b.   deeming Shaw's mortgage account and loan status to be delinquent and in default of the governing loan documents and security agreements;

c.   placing all of Shaw's timely and full mortgage payments made in anticipation of and pursuant to the Permanent Loan Modification Agreement into a holding or suspension account and refusing to apply those payments as required under the Permanent Loan Modification Agreement;

d.   demanding that Shaw immediately pay in excess of $30,000 in order to bring his original October 3, 2003, agreement current; and

e.   demanding that Shaw execute a new and different loan modification agreement.

127.   As a direct and proximate result of the breach by CitiMortgage of the Permanent Loan Modification Agreement, Shaw as suffered damages in an amount in excess of Ten Thousand dollars ($10,000).

128.   As a further direct and proximate result of CitiMortgage's breach of the Permanent Loan Modification Agreement, Shaw has been required to hire an attorney to represent him in this matter and seeks an award of his attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

129.   The preceding paragraphs of this Complaint are alleged and incorporated by reference as if fully stated here.

130.   The May/June 2011 Permanent Loan Modification Agreement imposed on CitiMortgage, as part of the contract, the implied covenant of good faith and fair dealing,

which prohibited arbitrary or unfair acts by CitiMortgage that worked to the disadvantage of Shaw.

131.   CitiMortgage breached the implied covenant of good faith and fair dealing by executing and entering into the May/June 2011 Permanent Loan Modification Agreement with Shaw, accepting the payments made by Shaw in his efforts to qualify for and then pursuant to the terms of the Permanent Loan Modification Agreement, and then unilaterally disavowing and repudiating the validity of the Permanent Loan Modification Agreement by reversing the timely payments Shaw made under the agreement, putting his account into a delinquent status, demanding that Shaw bring his account current under the original mortgage agreement, and demanding that he execute and new and different loan modification agreement.  CitiMortgage further wrongfully impugned Shaw's credit by falsely reporting to credit companies that Shaw had failed to make his mortgage payments.

132.   CitiMortgage's acts in violation of the implied covenant of good faith and fair dealing were arbitrary and unfair and worked to the extreme disadvantage of Shaw.

133.   As a direct and proximate result of the breach by CitiMortgage of the covenant of good faith and fair dealing implied into the Permanent Loan Modification Agreement, Shaw as suffered damages in an amount in excess of Ten Thousand dollars ($10,000).

134.   As a further direct and proximate result of CitiMortgage's breach of the covenant of good faith and fair dealing implied into the Permanent Loan Modification Agreement, Shaw has been required to hire an attorney to represent him in this matter and seeks an award of his attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
**(Fraudulent Misrepresentation or Concealment)**

135.   The preceding paragraphs of this Complaint are alleged and incorporated by

reference as if fully stated here.

136.   On or about July 18, 2011, CitiMortgage abruptly disavowed and dishonored its fully executed Permanent Loan Modification Agreement with Shaw.

137.   When CitiMortgage disavowed and dishonored its Permanent Loan Modification Agreement with Shaw, it:

a.   unbooked and reversed all full, timely and proper payments previously tendered by Shaw to CitiMortgage in accordance with the temporary and permanent loan modification agreements entered into between the parties beginning in January 2011;

b.   declared Shaw's loan account to be in default, delinquent, and past-due;

c.   charged against the balance in Shaw's loan account his pre-modified monthly payment obligation of approximately $4,100 per month against the payments he made pursuant to the terms of the modifications loan agreement of approximately $3,200 per month;

d.   demanded of Shaw, as a condition to his obtaining a valid, legal, enforceable and binding loan modification agreement that he sign new and different loan modification agreements with CitiMortgage; and

e.   demanded that Shaw return to CitiMortgage a new and different loan modification document under the pressure of denying Shaw any modification of his loan terms.

f.   Reported to credit agencies that Shaw had defaulted on his mortgage, thereby impugning his credit.

138.   On or about August 23, 2013, CitiMortgage made false representations of

material fact to Shaw, for the purpose of causing Shaw to rely on said representation, which it knew at the time were false, all as set forth herein below.

139.    On or about August 23, 2011, CitiMortgage, via its counsel, advised Shaw that the fully-executed Permanent Loan Modification Agreement was legally sufficient and, on that basis, CitiMortgage would re-book the modified payments Shaw made pursuant to the agreement, remove the delinquencies from his account, and continue to accept payments from Shaw pursuant to the terms of the Permanent Loan Modification Agreement.

140.    At the time CitiMortgage made those representations to Shaw, both the Underwriting and Legal Departments of CitiMortgage had determined that CitiMortgage would not abide by, accept, recognize as legally enforceable, or respect the fully executed May/June 2011 Permanent Loan Modification Agreement.

141.    CitiMortgage intended to induce Shaw to continue making payments, in whatever sum it could collect from Shaw, including payments for late fees and other delinquency charges, without disclosing to Shaw that, in truth, CitiMortgage did not believe the May/June 2011 Permanent Loan Modification Agreement to be legally sufficient or that it would not continue to accept and apply payments from Shaw as provided in the Permanent Loan Modification Agreement.

142.    Shaw relied on said misrepresentations, believing them to be true and:

    a.    Continued to live in said home, making modified mortgage payments that were not fully credited to his mortgage;

    b.    Incurred secret default, which included the secret assessment of penalties, late fees and other charges;

    c.    Refrained from seeking a sale of the property;

d.   Forwent legal rights, including legal action and/or bankruptcy; and

e.   Suffered adverse credit rating which plague him to this day.

143.   As a result of the foregoing, Shaw has suffered damage in excess of $10,000, which include, but are not limited to the following:

a.   The fair market value of Shaw's home has been diminished, in an amount to be proven at trial by CitiMortgage's scheme to defraud Shaw and cause his mortgage default;

b.   Through its fraudulent scheme CitiMortgage gained control of Shaw's property, and then refused, in bad faith to consider any "short sale" offers for the house.  As a direct and proximate cause thereof, Shaw was damaged in the sum of $857,000 by virtue of lost sale opportunity;

c.   Shaw was damaged in the total amount of mortgage payments he paid, but could have withheld, to CitiMortgage during the time he believed CititMortgage's false statement that it would honor the loan modification.  Said sum will be proven at the trial hereof.

144.   The fraudulent misrepresentations by CitiMortgage were intentional, malicious, and oppressive, for which Shaw is entitled to recover punitive and exemplary damages in excess of $10,000.

145.   As a further direct and proximate result of CitiMortgage's fraudulent misrepresentations and concealment, Shaw has been required to hire an attorney to represent him in this matter and seeks an award of his attorneys' fees and costs.

### SIXTH CAUSE OF ACTION
**(Negligent Misrepresentation)**

146.   The preceding paragraphs of this Complaint are alleged and incorporated by

reference as if fully stated here.

147.    As an alleged mortgage holder and servicer of the McFaul Court home, CitiMortgage has a pecuniary interest in its relationship with Shaw as the titleholder to the McFaul Court home.

148.    On or about August 23, 2011, after CitiMortgage unilaterally disavowed and dishonored the May/June 2011 Permanent Loan Modification Agreement and, among other things, reversed Shaw's payments and put his account into delinquent status, CitiMortgage, via its counsel, advised Shaw that the fully-executed Permanent Loan Modification Agreement was legally sufficient and, on that basis, CitiMortgage would re-book the modified payments Shaw made pursuant to the agreement, remove the delinquencies from his account, and continue to accept payments from Shaw pursuant to the terms of the Permanent Loan Modification Agreement.

149.    In reliance on CitiMortgage's August 23, 2011, representations, and believing them to be consistent with the fully-executed Permanent Loan Modification Agreement, Shaw forewent and/or substantially delayed, to his extreme detriment, his ability to exercise other and additional rights and remedies in response to CitiMortgage's July 18, 2011, breach of the Permanent Loan Modification Agreement in that Shaw elected to maintain ownership of the McFaul Court home rather than, among other things, file for bankruptcy relief, commence suit at that time against CitiMortgage, pursue a sale of the McFaul Court home, or otherwise allow the McFaul Court home to properly proceed to foreclosure.

150.    After CitiMortgage made its August 23, 2011, representations to Shaw and Shaw relied, to his detriment, on those representations, CitiMortgage maintained its position that Shaw had no rights or entitlements under the May/June Permanent Loan Modification

Agreement and charged against Shaw's loan account the pre-modification monthly payment amount and in excess of the amount he had timely paid pursuant to the Permanent Loan Modification Agreement.

151. CitiMortgage failed to exercise reasonable care or competence in obtaining communicating its August 23, 2011, representations to Shaw in that, at the time those representations were made, both the Underwriting and Legal Departments of CitiMortgage had determined that CitiMortgage would not abide by, accept, recognize as legally enforceable, or respect the fully-executed May/June 2011 Permanent Loan Modification Agreement.

152. As a direct and proximate result of the negligent misrepresentations by CitiMortgage, Shaw has suffered damages in an amount in excess of Ten Thousand dollars ($10,000).

153. As a further direct and proximate result of CitiMortgage's fraudulent misrepresentations and concealment, Shaw has been required to hire an attorney to represent him in this matter and seeks an award of his attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
### (Interference with Prospective Economic Advantage)

154. The preceding paragraphs of this Complaint are alleged and incorporated by reference as if fully stated here.

155. In an effort to avoid foreclosure of his home under the facts and circumstances that have given rise to this case, and in response to CitiMortgage's January 2013 Notice of Default and Election to Sell that was recorded against the McFaul Court home and scheduled the foreclosure sale for May 30, 2013, and June 5, 2103, Shaw began his efforts to sell the McFaul Court home as a short sale property.

156. After receiving an offer on the McFaul Court home in February 2013 for more

than $100,000 above the short-sale listing price, Shaw submitted the offer to CitiMortgage for approval.

157.    Despite repeatedly providing documents and information requested by the CitiMortgage representative to which the offer was submitted and notwithstanding that the proposed closing date for the sale was extended numerous times over a 90-day period in order to accommodate a response by CitiMortgage to the offer, CitiMortgage never substantively responded to the offer with an approval or disapproval.

158.    As a result of CitiMortgage's failure to respond to the offer on the McFaul Court home, the short sale was terminated in May 2013.

159.    After the May/June 2013 foreclosure sale dates were rescheduled for August 9, 2013, Shaw was able to revive the previous February 2013 short sale offer, and in August 2013, again presented that offer to CitiMortgage.

160.    Shaw repeated the same process over several months with CitiMortgage as it had in February through May of 2013 in reference to the first short sale offer until November 2013, when counsel for CitiMortgage requested that the offer be presented directly to him.

161.    Despite extensions of time for the close of the sale and direct communication of the offer to counsel for CitiMortgage as requested, CitiMortgage never responded to the offer, and the sale was again terminated.

162.    In December 2013, after a request by counsel for CitiMortgage to put the McFaul Court home back on the market for sale, Shaw again listed the home for sale, and in April 2104, received a new and different short sale offer for the home.

163.    Despite that Shaw presented the offer to CitiMortgage in April 2014, this Court, in May 2014, required that CitiMortgage respond to the offer. CitiMortgage responded to the

offer a day late, and refused to accept the offer.

164.    In addition, Shaw presented yet another short sale offer to CitiMortgage in the amount of $825,000 on July 14, 2014, which had a five day expiration, and to which CitiMortgage has never responded.

165.    By virtue of the four different offers on the McFaul Court home, Shaw had prospective contractual relationships for the sale of the McFaul Court home.

166.    Based upon Shaw's submission to CitiMortgage of those offers for approval as required and requested by CitiMortgage, CitiMortgage had knowledge of Shaw's prospective contractual relationships.

167.    By refusing to respond to the offers submitted by Shaw to it, even after counsel for CitiMortgage specifically requested submission of one of the offers directly to him and this Court required that CitiMortgage respond to the third offer Shaw received on the McFaul Court home, CitiMortgage intended to harm Shaw by preventing the sale of the home, and it did so without justification or privilege.

168.    As a direct and proximate result of the intentional interference by CitiMortgage of Shaw's prospective economic advantage, Shaw has suffered damages in an amount in excess of Ten Thousand dollars ($10,000).

169.    CitiMortgage's conduct in preventing the sale of the McFaul Court home by refusing to respond to the numerous offers submitted to it for consideration, even when required to do so by this Court, was intentional, malicious, and oppressive, for which Shaw is entitled to recover punitive and exemplary damages.

170.     As a further direct and proximate result of CitiMortgage's interference with Shaw's prospective economic advantage, Shaw has been required to hire an attorney to represent him in this matter and seeks an award of his attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### (Statutory Violations)

171.     The preceding paragraphs of this Complaint are alleged and incorporated by reference as if fully stated here.

172.     The applicable provisions of the Dodd-Frank Wall Street Reform Act (Public Law 111-203), in full force and effect as of May 1, 2011, entitle homeowners, upon submission of a qualified written request, to the contact information for an individual or entity authorized to address, negotiate, and resolve issues regarding nonperforming residential home loans.

173.     Also in effect as of May 1, 2011, is the Real Estate Settlement Procedures Act (12 U.S.C. § 1206, *et. seq.*) that grants to homeowners the right and entitlement to certain information and legal protections as to debt collection efforts of residential home lenders.

174.     On or about July 18, 2011, and continuing as of the filing of this *Second Amended Complaint*, Shaw, who is a qualified homeowner and residential home loan borrower, has made qualified written demands of CitiMortgage for information to which he is assured and guaranteed access under the above-described federal legislation.

175.     As a direct and proximate result of CitiMortgage's refusal to provide Shaw the information to which he is entitled under the above-described federal legislation, CitiMortgage has deprived Shaw of access to an individual or entity authorized to negotiate a resolution of his residential home loan on the McFaul Court home that has been nonperforming since

January 2012, and thereby precluded any effort by Shaw to address the payment obligations at issue in this case.

WHEREFORE, Shaw prays for:

1.    Judgment in his favor and against the Defendants on all claims in this Complaint;

2.    Declaratory relief as requested;

3.    An award of damages in his favor and against the Defendants, according to proof.

4.    An award of exemplary and punitive damages in his favor and against the Defendants, according to proof, on all applicable claims in this Complaint.

5.    An award to him and against the Defendants of his interests, costs and attorney's fees;

6.    For such other and further relief as the Court deems just and proper.

DATED this 25th day of August, 2014.

By:/s/ John Ohlson
John Ohlson, Esq.
NV BAR 1672
275 Hill Street, Suite 230
Reno, Nevada  89501
Telephone:  (775) 323-2700
Email:  John@OhlsonLaw.com
*Attorney for Plaintiff*
*Leslie J. Shaw*

## CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b), I certify that I am an employee of John Ohlson and not a party to, nor interested in, the within action; that on this 25th day of August, 2014, I electronically filed the foregoing **PLAINTIFF'S SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Brett Ryan, Esq.
Joseph Bleeker, Esq.
RCO Legal, PS
2485 Village View Dr., Suite 190
Henderson, NV 89074

Andrew Bao, Esq.
Colt B. Dodrill, Esq.
WOLFE & WYMAN LLP
980 Kelly Dr., Suite 140
Las Vegas, NV 89119

*/s/ Robert M. May*
An employee of John Ohlson