1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LESLIE J. SHAW,

          Plaintiff,

   v.

CITIMORTGAGE, INC.; *et al.*,

          Defendants.

3:13-CV-0445-LRH-VPC

<u>ORDER</u>

13      This is a breach of contract action arising from an alleged residential loan modification

14 agreement between plaintiff Leslie J. Shaw ("Shaw") and defendant CitiMortgage, Inc. ("CMI").

15 Shaw alleges that in mid-2011, the parties executed a loan modification agreement on his

16 residential home loan, but CMI breached the agreement prompting Shaw to stop making payments

17 on his modified loan. Shaw then fell into default and CMI initiated non-judicial foreclosure

18 proceedings in early 2013.

19      On July 26, 2013, Shaw filed a complaint against CMI and defendant Northwest Trustee

20 Services, Inc. ("NTS"), the trustee identified on the recorded notice of default. ECF No. 1,

21 Exhibit A, p. 8-19. On April 3, 2014, Shaw filed an amended complaint adding defendant Bank of

22 New York Mellon ("BNY"), as trustee for SASCO Fund 2003-37A, as a defendant to this action.

23 ECF No. 52. Subsequently, on August 25, 2014, Shaw filed a second amended complaint against

24 defendants alleging eight causes of action: (1) declaratory relief against defendant BNY;

25 (2) declaratory relief against defendant CMI; (3) breach of contract; (4) breach of the implied

26 covenants of good faith and fair dealing; (5) fraudulent misrepresentation and concealment;

(6) negligent misrepresentation; (7) interference with prospective economic advantage; and (8) violation of the Real Estate Settlement Procedures Act ("RESPA"). ECF No. 109.

On January 14, 2015, the court granted defendant NTS' motion to dismiss (ECF No. 110) and dismissed NTS as a defendant in this action. ECF No. 124. Three weeks later, on February 5, 2015, the court granted defendants BNY and CMI's motion to dismiss (ECF No. 113). ECF No. 128. In that order, the court dismissed BNY as a defendant and dismissed Shaw's fifth cause of action for fraudulent misrepresentation and sixth cause of action for negligent misrepresentation. *Id*.

A bench trial was held on Shaw's remaining claims[1] against sole-remaining defendant CMI from May 3 through May 5, 2016. *See* ECF Nos. 203-05. The court, having heard the testimony of all witnesses at trial[2] and having considered all exhibits accepted into evidence, renders the following findings of fact and conclusions of law:[3]

**I.      Findings of Fact**

1.      Plaintiff Shaw is a resident of the State of Nevada. Shaw is also an attorney duly licensed to practice law in the States of Nevada and California. Shaw practices primarily in the areas of family and divorce law and during the relevant time period had a practice at Lake Tahoe that moved to Reno, Nevada.

///

---

[1] Shaw's remaining claims are his second cause of action for declaratory relief, third cause of action for breach of contract, fourth cause of action for breach of the implied covenants of good faith and fair dealing, seventh cause of action for interference with prospective economic advantage, and eighth cause of action for violation of RESPA.

[2] At trial the court heard the live testimony of plaintiff Leslie Shaw; Attorney Colt Dodrill, counsel of record for defendant CMI; Jill Hackman, business operations analyst and corporate representative of CMI; Dan Leck, Shaw's real estate expert; and Michael Brunson, CMI's real estate expert. The court also heard the testimony by deposition of Travis Nurse, CMI's designated Rule 30(b)(6) witness; Christopher Gabbert, a CMI employee in the Executive Response Unit; Attorney Dana Ross, Assistant General Counsel for CMI; Katherine Barkley, junior lien holder; and Janice Shaw, Shaw's ex-wife and junior lien holder.

[3] If any finding of fact herein is considered to be a conclusion of law, or any conclusion of law is considered to be a finding of fact, it is the court's intention that it be so considered.

2.  In 2001, Shaw purchased a vacant lot located in Zephyr Cove, Nevada, and built a single-family residence commonly known as 251 McFaul Court ("the McFaul Court property"), the underlying residential property at issue in this action.

3.  On October 8, 2003, Shaw executed a promissory note for a residential home loan on the McFaul Court property in favor of non-party Lehman Brothers Bank, FSB ("Lehman Brothers"), a federal savings bank, in the amount of $875,000.00 with an adjustable interest rate starting at 5.125%. The residential loan was secured by a first deed of trust recorded against the McFaul Court property on October 14, 2003, in the official records of Douglas County, Nevada (Doc. No. 0593479). Def. Trial Ex. 501-B, CMI000001-22.

4.  Immediately following the execution of the residential home loan, non-party Aurora Loan Services ("Aurora"), a servicing branch of Lehman Brothers, began servicing Shaw's residential loan and accepted all mortgage payments on behalf of non-party Lehman Brothers. In June 2005, Aurora ceased servicing the loan and transferred the servicing rights to CMI.

5.  At some point prior to the relevant time period, Lehman Brothers sold Shaw's residential home loan as part of an investment mortgage package to an unknown party.

6.  Defendant CMI, a foreign corporation duly qualified to conduct business in the State of Nevada, is a mortgage servicing company. CMI is owned by non-party CitiBank and is part of the Citi Group corporate organization. Since June 2005, CMI has been servicing Shaw's residential home loan and has collected all payments on behalf of the various owners of the loan. On June 20, 2012, CMI became the beneficiary under the first deed of trust pursuant to an assignment of deed of trust recorded in the official records of Douglas County, Nevada (Doc. No. 0804389). Def. Trial Ex. 504-B, CMI000038-39.

7.  Each mortgage account serviced by CMI is assigned an electronic account file. The electronic account file, identified by a specific numerical identifier (the mortgage account number), is accessible to CMI employees and contains information about each particular

3

account including payment information, loan terms, account notes, and other relevant account information. As part of its servicing of Shaw's residential home loan, CMI maintained such an electronic account file for Shaw's loan. It is in this electronic account that CMI booked the terms of Shaw's residential loan and all payments made under that agreement.

8. In August 2006, Shaw and his then wife, non-party Janice Shaw, separated. As part of their eventual divorce - as evidenced by the divorce decree issued in July 2007 - Shaw was awarded the McFaul Court property as his sole and separate property.

9. On or about January 19, 2007, Shaw obtained a loan from non-party Katherine Barkley in the amount of $225,000.00 at an annual interest rate of 10%. This loan was secured by a second deed of trust recorded against the McFaul Court property on January 23, 2007, in the official records of Douglas County, Nevada (Doc. No. 0693296). Def. Trial Ex. 502-B, CMI000023-27.

10. On September 20, 2007, a third deed of trust was recorded in the amount of $77,123.50 against the McFaul Court property in favor of non-party Janice Shaw, Shaw's ex-wife, in the official records of Douglas County, Nevada (Doc. No. 0709512). Def. Trial Ex. 503-B, CMI000028-37.

11. In 2010, Shaw began experiencing financial difficulties. On or about the fall of 2010, while still current on his monthly mortgage payments, Shaw contacted CMI to request a modification of his residential mortgage loan. At that time, Shaw's monthly mortgage obligation was approximately $4,300.00.

12. During the relevant time period, CMI had a company policy that it would not consider any application for the modification of an existing loan unless a borrower was at least three (3) months in arrears on the borrower's monthly mortgage obligations. This policy was communicated to Shaw during one of the telephonic conversations in the fall of 2010.

///

13. Beginning October 2010, and continuing through December 2010, Shaw withheld his monthly mortgage payments from CMI. Def. Trial Ex. 510-B, CMI000067. Shaw then contacted CMI and received a loan modification application. Shaw completed and submitted the application to CMI in early December 2010.

14. CMI reported Shaw's mortgage account as delinquent to the various credit reporting agencies for the months that Shaw withheld payment on his account: October, November, and December 2010.

15. At the time he submitted his loan modification application Shaw had never, in memory, been denied an application for credit and was current on all credit obligations except for his mortgage account.

16. On December 24, 2010, Shaw received an e-mail from CMI. Pl. Trial Ex. 1, P00001. The e-mail advised Shaw that his "mortgage assistance request [had] been approved" and he could expect a "mortgage solution package within the next 5-7 business days." *Id*.

17. On December 28, 2010, four days after receiving CMI's approval e-mail, Shaw received a letter from CMI denying his request for a loan modification. Pl. Trial Ex. 2, P00002-5. The letter specifically stated that CMI could not "approve a mortgage modification under the government's Home Affordable Modification Program ("HAMP")" and that Shaw's "mortgage terms [would] remain unchanged." *Id*. at P00002. At the time Shaw received this letter from CMI, he had not applied for a specific HAMP loan modification. Rather, Shaw had only applied for a general loan modification with defendant CMI.[4]

---

[4] During the relevant time period, CMI had a policy that when a borrower submitted a completed loan modification application, Loss Mitigation would review the application for all available modification options - from company modification options to government supported modification programs like HAMP. However, it was not CMI's policy to advise or disclose to applicants that an application would be reviewed by Loss Mitigation for all possible modification options including government programs. Nor was it CMI's policy to advise or disclose to applicants that they may receive several responses from CMI concerning the outcome of an application and that such responses could differ in whether an application was approved or denied.

In accordance with CMI's policies, Loss Mitigation reviewed Shaw's application and determined, through an underwriter, that Shaw was eligible for a modification of his existing residential loan but was

18.    Commencing on or about December 28, 2010, and continuing through February 2011,

Shaw began near daily telephonic efforts with CMI to resolve the inconsistent and

contradictory written communications of December 24 and December 28, 2010. Despite

repeated phone calls with CMI employees in various departments, including Loss

Mitigation, Shaw never received an explanation as to why he received two separate

communications from CMI about his loan modification application, or why he had been

denied a modification after already receiving notification that his application had been

approved.[5] Further, Shaw did not receive an answer from CMI as to which of the two

communications constituted CMI's final determination of his loan modification

application.

19.    Shaw did not make either of his monthly mortgage payments for January or February

2011. Def. Trial Ex. 510-B, CMI000067. Subsequently, CMI reported Shaw's mortgage

account as delinquent to the various credit reporting agencies for those months.

20.    Between December 28, 2010, and early February 2011, Shaw did not receive any written

communication from CMI concerning his loan modification application.

21.    On February 15, 2011, Shaw received another e-mail from CMI. Pl. Trial Ex. 3, P00006.

This e-mail again advised Shaw that his "mortgage assistance request [had] been

approved" and that he could expect a "mortgage solution package within the next 5-7

business days." *Id*.

---

ineligible for a HAMP modification. But Shaw was never advised that his application would be considered for all available modification options, that he would receive multiple responses from CMI about his application, that those responses could be contradictory (as they were in this case), and which of those responses would constitute CMI's final determination of his application.

[5] At trial, it was explained for the first time that Shaw had received a separate response on his loan modification application relating specifically to the government's HAMP program because any denial of a modification under HAMP must be directly communicated to the buyer and contain the reasons for the denial along with information related to other loan modification programs and credit counseling. This simple explanation was never provided to Shaw throughout the history of this action.

22.  On or about February 16, 2011, after receiving CMI's second approval e-mail, Shaw received another letter from CMI again denying his request for a loan modification. Pl. Trial Ex. 4, P00007-10. The letter specifically stated that CMI could not "approve a mortgage modification under the government's Home Affordable Modification Program ("HAMP")" and that Shaw's "mortgage terms [would] remain unchanged." *Id*. at P00007.

23.  Commencing February 16, 2011, Shaw again contacted CMI to resolve the inconsistent and contradictory written communications concerning his loan modification application. Despite repeated calls with CMI employees, Shaw never received an explanation why he had received new communications regarding his application,[6] or why he had once again been denied mortgage assistance after receiving notification that his loan modification application had been approved. Further, Shaw did not receive an answer from CMI as to which of the four communications constituted CMI's final determination of his loan modification application.

24.  On or about February 23, 2011, Shaw received a mortgage solution package from CMI. Def. Trial Ex. 505-A, CMI000051-56. The mortgage solution package advised Shaw that he had been "approved to enter into a trial period plan" modifying his residential loan for a period of ninety (90) days. *Id*. at CMI000051. The package further advised Shaw that in order to qualify for a permanent modification, Shaw must comply with two requirements. First, Shaw was required to timely make three modified monthly mortgage payments of

---

[6] At trial, it was explained that Shaw had received two separate sets of written communications, first in December 2010 and then again in February 2011, because of the amount of principal remaining on his residential loan. In December 2010, an underwriter for CMI approved Shaw for a modification of his existing loan obligations. Based on that decision, the first set of communications was sent to Shaw in December 2010.
    However, because Shaw's remaining principal obligation was substantial (over $800,000), the original underwriter did not have final authority on Shaw's application and a manager-level underwriter had to separately review Shaw's application and make a final determination on whether to approve or deny the application. Upon review, this manager-level underwriter approved Shaw's application and another set of communications was sent to Shaw in February 2011. Once again, this simple explanation was never provided to Shaw throughout the history of this action.

$3,079.30 starting March 2011. *Id*. Second, Shaw was required to submit various documents to CMI. *Id*. If Shaw complied with both requirements, CMI advised Shaw that his residential home loan would be "permanently modified" and it would send him "a modification agreement detailing the terms of the modified loan." *Id*. at CMI000052.

25. Shaw timely made all three required trial payments of $3,079.30 under the trial period plan for the months of March, April, and May 2011. Def. Trial Ex. 510-B, CMI000067.

26. CMI reported Shaw delinquent on his mortgage account to the various credit reporting agencies for the months of March, April, and May 2011, despite granting Shaw a trial modification plan and having received all three modified payments in a timely manner. By this time, Shaw had been reported delinquent on his mortgage account for eight months.

27. During the time period after submitting his loan modification application through the time of the trial modification plan, Shaw received various collection calls from CMI seeking payment on his delinquent account. Approximately April 2011, Shaw registered for CMI's no-call list, thereby precluding CMI from initiating telephonic contact with Shaw. Since that time, Shaw has received no telephonic attempts to collect on his mortgage account.

28. On May 11, 2011, having submitted all trial plan payments, Shaw received an e-mail from CMI advising him that his "mortgage assistance documents [had] been sent" the previous day, May 10, 2011. Pl. Trial Ex. 5, P00011. The e-mail further directed Shaw to "review and sign the documents as instructed." *Id*.

29. On May 18, 2011, Shaw received a letter from CMI authored by CMI employee Kim Vukovich ("Vukovich"). Pl. Trial Ex. 6, P00014-20. The letter advised Shaw that he was "eligible for a Citi Affordable Modification" and directed him to complete and return the enclosed modification agreement (also prepared by Vukovich) no later than May 20, 2011. *Id*. at P00014. The enclosed proposed modification agreement, titled "Citi Affordable Modification Agreement" ("May 2011 Modification Agreement"), outlined

8

the various terms of the proposed loan modification. *Id*. at P00016-20. Those terms included, in relevant part to this action, that: (1) permanent modified payments in the amount of $3,079.30[7] would commence starting June 1, 2011; (2) the new principal balance under the modified loan would be set at $910,110.34 and include all past due amounts, including the difference between the original monthly payment amount (approximately $4,300) and the payment amount made under the three months of the trial modification plan ($3,079.30); (3) $85,777.89 of the new principal balance was deferred from interest charges during the life of the modification and would be due as a balloon payment; (4) the effective date of the properly executed agreement would be May 1, 2011; and (5) the maturity date under the modified  loan would be November 1, 2033. *Id*.

30.     Also on May 18, 2011, Shaw promptly executed, by notarized signature, the May 2011 Modification Agreement and submitted the signed agreement to CMI via an enclosed Next Day Air envelope. Pl. Trial Ex. 6, P00013; Def. Trial Ex. 506-A, CMI000061.

31.     On May 19, 2011, CMI received the executed May 2011 Modification Agreement. Pl. Trial Ex. 7, P00021.

32.     On May 23, 2011, CMI entered and booked the terms of the May 2011 Modification Agreement into Shaw's electronic mortgage account. Def. Trial Ex. 510-B, CMI000066. At the time CMI booked the terms of the modification, CMI misentered the length of the loan, extending the loan from three hundred and sixty (360) months to four hundred and eighty (480) months. *Id*. This administrative booking error extended the loan maturity date and subsequent due date of the $85,777.89 balloon payment from November 1, 2033, to November 1, 2045.

---

[7] The proposed modification agreement contained a staggered payment and interest rate schedule that increased the monthly payment on Shaw's modified loan over the course of several years. *See* Pl. Trial Ex. 6, P000018. However, for purposes of this order and the relevant time period, Shaw's modified payment was $3,079.30. *Id*.

33. Shaw timely made his modified mortgage payments of $3,079.30 for the months of June and July 2011. Def. Trial Ex. 510-B, CMI000066.

34. On June 30, 2011, Larry Bauman, Vice-President for CMI, executed, by notarized signature, the May 2011 Modification Agreement. Def. Trial Ex. 506-A, CMI000061; Pl. Trial Ex. 18,  P00055-56.

35. From May 20, 2011, through mid-July 2011, Shaw did not receive any communication from CMI concerning the May 2011 Modification Agreement and was not informed that the agreement had been executed by CMI.

36. Prior to July 2011, Shaw maintained, in good standing, a Diners Club Charge Card credit account and had sufficient credit to qualify as a cosigner on his daughter's student loans obtained through non-party Wells Fargo Bank. At that time, Shaw was also at the tail end of a thirty-six (36) month lease agreement with non-party Audi Financial Services on a 2008 Audi A-4 automobile.

37. Approximately early-July 2011, Loss Mitigation reviewed Shaw's mortgage account and unilaterally determined that there was an issue with the modified terms of his residential loan booked pursuant to the May 2011 Modification Agreement documents. Loss Mitigation then, without consultation or communication with Shaw, unbooked the May 2011 Modification Agreement from Shaw's electronic mortgage account. Def. Trial Ex. 510-B, CMI000065-66. This action automatically unbooked Shaw's timely made modified mortgage payments under both the trial and permanent modification periods, and placed his account in default. *Id*. As Shaw's account then showed that no payment had been made on his account for the months of June and July 2011, CMI reported Shaw's account as delinquent to the various credit reporting agencies for those months.

38. On July 15, 2011, non-party BMO Financial Group sent Shaw a letter advising him that his Diners Club Charge Card account, a credit account with Citicorp Credit Services, Inc., was going to be closed effective July 20, 2011. Pl. Trial Ex. 50, P00022.

10

39. On July 16, 2011, non-party U.S. Bank, National Association sent Shaw a letter advising him that his credit application for an auto loan to purchase his leased 2008 Audi A-4 automobile had been denied. Pl. Trial Ex. 51, P00023.

40. On July 18, 2011, CMI sent Shaw a letter advising him that his mortgage account was in default and that monthly mortgage payments had not been made as required under his residential home loan. Pl. Trial Ex. 10, P00035-36. In that letter, CMI further demanded Shaw pay, in full, the past due amount of $31,684.34 by August 18, 2011, or the McFaul Court property could be sold in accordance with the terms of the first deed of trust. *Id*. at P00035.

41. On July 19, 2011, CMI sent Shaw a letter authored by CMI employee Juan Mayorga ("Mayorga").[8] Pl. Trial Ex. 9, P00025-33. This letter again advised Shaw that he was "eligible for a Citi Affordable Modification" and directed him to complete and return the new "corrected" modification agreement (separately prepared by Mayorga) no later than August 2, 2011. *Id*. at P00025. The enclosed "corrected" modification agreement, again titled "Citi Affordable Modification Agreement" ("July 2011 Modification Agreement"), outlined the various terms and provisions of the new agreement. *Id*. at P00027-33. The majority of the terms in the July 2011 Modification Agreement were similar, or even identical, to the terms and provisions of the May 2011 Modification Agreement, including that: (1) permanent modified payments of $3,079.30 would commence starting June 1, 2011;[9] (2) the modified principal balance was set at $910,110.34; (3) $85,777.89 of the principal balance was deferred from interest charges and would be due as a balloon

---

[8] No mention was made during the course of trial as to why Mayorga had been assigned to Shaw's account to draft the "corrected" modification agreement or what happened to Vukovich during that two month period.

[9] This June 1, 2011 date was still established as the first due date for modified payments even though the July 2011 Modification Agreement was not drafted until some time in July 2011, and sent to Shaw on July 19, 2011.

payment; (4) the effective date of the properly executed agreement would be May 1, 2011; and (5) the maturity date under the modified residential loan would be November 1, 2033. *Id*. However, the July 2011 Modification Agreement also included specific language establishing the due date of the deferred principal balloon payment that was not in the May 2011 Modification Agreement. *Compare* Pl. Trial Ex. 6 at P00018 (no date) *with* Pl. Trial Ex. 9 at P00028 (establishing the maturity date of the modified loan (November 1, 2033) as the due date). Further, the "corrected" agreement contained several additional provisions that were not in the May 2011 Modification Agreement, including Section 5(G). *Id*. at P00032. Section 5(G) required, in pertinent part, that under the July 2011 Modification Agreement Shaw would be required to execute any and all other documents requested by CMI or forfeit all his rights under the modified agreement. *Id*. ("If I elect not to sign any such corrected documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification . . . .").

42.   On July 20, 2011, Shaw received an e-mail from CMI advising him that "mortgage assistance documents" had been sent on July 19, 2011. Pl. Trial Ex. 8, P00024. The communication further directed Shaw to "review and sign the documents as instructed." *Id*. On the same day, Shaw received CMI's communications dated July 18 and July 19, 2011. Shaw immediately contacted CMI, including a conversation with Mayorga, but was never provided an explanation why his mortgage account was placed in default, or why a new modification agreement had been sent only two months after he executed and submitted the May 2011 Modification Agreement. Instead, Shaw was directed to review and sign the July 2011 Modification Agreement.[10]

---

[10] At trial, it was established that the May 2011 Modification Agreement was missing language in the balloon payment provision setting a specific due date for the balloon payment, although the agreement contained the correct loan maturity date of November 1, 2033. Thus, when CMI received the executed

43. On July 21, 2011, Shaw sent a letter to Mayorga objecting to CMI's handling of his mortgage account, including CMI's unilateral decision to unbook the May 2011 Modification Agreement and place his mortgage account in default, as well as the additional material terms in the July 2011 Modification Agreement not present in the May 2011 Modification Agreement. Pl. Trial Ex. 13, P00040.

44. Shaw did not execute the July 2011 Modification Agreement.

45. On July 22, 2011, Shaw received a letter from CMI dated July 20, 2011, advising him that CMI had reviewed his loan modification application and could not approve a modification at that time. Pl. Trial Ex. 11, P00037-38. CMI sent the letter to Shaw even though it had already executed the May 2011 Modification Agreement and sent the separate July 2011 Modification Agreement.

46. Also on July 22, 2011, Shaw received an e-mail from CMI advising Shaw that his "mortgage assistance documents [had] been received by [CMI.]" Pl. Trial Ex. 12, P00039. However, Shaw had not submitted any mortgage assistance documents to CMI and had refused to execute the July 2011 Modification Agreement.

47. Commencing late July 2011, Shaw again contacted CMI to resolve the inconsistent and contradictory communications received during the previous weeks including why he had received a loan modification denial letter after having just received the July 2011 Modification Agreement. Once again, Shaw did not receive any explanation from CMI for these contradictory communications.

---

agreement and booked the modification terms into Shaw's electronic mortgage account, CMI mistakenly entered a 480 month term for the balloon payment, thereby extending Shaw's loan past the maturity date. When Loss Mitigation audited Shaw's mortgage account in July 2011, it determined that a "corrected" modification agreement should be sent to Shaw containing a specific due date for the balloon payment, that of the maturity date of November 1, 2033. This "corrected" agreement was sent to Shaw in order to correct CMI's own mistake. However, no explanation was ever provided at trial as to why the July 2011 Modification Agreement, if all it was supposed to do was correct the balloon payment language error, contained additional material terms like Section 5(G), which placed additional duties and obligations on Shaw.

13

48.  Approximately July 2011, in response to Shaw's near daily communications with CMI, CMI deemed Shaw's mortgage account an Escalated Case and turned his account over to the Executive Response Unit, a CMI department dedicated to addressing customer account issues. Shaw's account was placed with Chris Gabbert ("Gabbert"), a Homeowner Support Specialist in the Executive Response Unit. Shaw contacted Gabbert to outline and discuss his ongoing mortgage and modification issues. At that time, Gabbert advised Shaw that the July 2011 Modification Agreement was the only modification agreement that CMI would accept, directed him to execute the agreement, and informed him that there was not a prior modification of his residential loan under the May 2011 Modification Agreement.

49.  As a result of CMI's repeated inconsistent communications and complete lack of any explanation for CMI's conduct in handling his mortgage account and loan modification, Shaw experienced increasing confusion, frustration, stress, and a general feeling of worthlessness over not being able to resolve his issues with CMI. This frustration and stress caused Shaw to suffer occasional sleeplessness during this time. Further, Shaw spent significant amounts of time and energy, sometimes as much as eight (8) hours in a single day, contacting CMI and dealing with various CMI employees that were unable to address his concerns or help with his mortgage and modification issues.

50.  Due to Shaw's ongoing frustration in dealing with CMI, Shaw sought the identity of the owner/beneficiary of his loan in the hopes of resolving his problems directly with the loan's owner.

51.  Between July 25 and July 28, 2011, Shaw contacted Gabbert several times. In those telephonic conversations, Shaw requested information about the current owner of his loan. Gabbert advised Shaw that the current owner of his loan was Lehman Brothers through Structured Asset Security Corporation ("SASCO") Mortgage Pass-Through Certificates.

///

52. On July 31, 2011, Shaw again e-mailed Gabbert. Pl. Trial Ex. 15, P00044-45. In that e-mail, Shaw specifically requested information related to the owner of his loan, as Shaw had determined on his own that Lehman Brothers had previously gone bankrupt and the SASCO Mortgage Pass-Through Certificates that included his residential loan had been transferred to a new, unknown owner. *Id*.

53. Shaw requested contact information for the current owner of his loan in order to seek a modification directly from the owner and to make sure that he was receiving credit from the owner for payments made on the mortgage.

54. Shaw timely made a modified mortgage payment in the amount of $3,079.30 for the month of August 2011. Def. Trial Ex. 510-B, CMI000065. CMI did not book Shaw's payment into his electronic mortgage account.

55. Approximately August 2011, Shaw applied for and was denied credit with non-party Audi Financial Services to purchase his Audi automobile which he had been leasing from Audi for approximately four (4) years.

56. On August 2, 2011, CMI sent Shaw another letter again advising Shaw that his mortgage account was in default and demanded Shaw pay, in full, the past due amount of $31,697.84 by September 2, 2011, or the McFaul Court property could be sold in accordance with the terms of the first deed of trust. Pl. Trial Ex. 16, P00046-47.

57. On August 9, 2011, CMI sent Shaw a letter from the Document Processing Modification Unit that included a copy of the completed and executed May 2011 Modification Agreement signed by CMI Vice-President Bauman. Pl. Trial Ex. 18, P00049-56. The letter advised Shaw that the copy of the agreement executed by both parties was solely for his records and that "no further action [was] necessary." *Id*.

58. Upon receiving his copy of the executed May 2011 Modification Agreement, Shaw immediately contacted Gabbert who initiated the involvement of Dana Ross ("Ross"), Assistant General Counsel of CMI, to resolve Shaw's mortgage account and loan

modification.

59. On August 12, 2011, after reviewing Shaw's account and the May 2011 Modification Agreement, Ross advised Shaw that he would be receiving a letter outlining CMI's resolution of Shaw's mortgage account and loan modification. Pl. Trial Ex. 22, P00061.

60. On August 15, CMI rebooked the terms of the May 2011 Modification Agreement into Shaw's electronic mortgage account. Def. Trial Ex. 510-B, CMI000064. As of that date, Shaw's account reflected all of the modification terms outlined in the May 2011 Modification Agreement, including principal amount, deferred principal amount, and modified payment amounts. *See* Pl. Trial Ex. 19, P00057-58. CMI also rebooked all payments Shaw made under the trial period plan and the May 2011 Modification Agreement to date. These actions brought Shaw's mortgage account current and removed his account from default.

61. On August 23, 2011, Ross sent Shaw an e-mail advising him that CMI had resolved the issues on his account and directed him to access a document on his online mortgage account constituting CMI's resolution. Pl. Trial Ex. 20, P00059. The aforementioned document was a letter signed by Gabbert explaining the actions CMI took on Shaw's mortgage account in July 2011, and outlining CMI's resolution of his account and modification. Pl. Trial Ex. 21, P00060. The resolution document advised Shaw that although the May 2011 Modification Agreement did not have clear balloon payment language (as no due date was specifically mentioned in that provision), the agreement correctly identified the appropriate maturity date for the loan (November 1, 2033), and thus, "there [was] nothing legally deficient with the [May 2011 Modification Agreement.]" *Id*. Further, the resolution document advised Shaw that CMI had already rebooked the May 2011 Modification Agreement and that his account was permanently modified under that agreement going forward. *Id*.

///

62. Shaw believed that he had a binding loan modification with CMI and that all his account issues had been resolved. Thereafter, Shaw timely made all modified monthly payments of $3,079.30 pursuant to the May 2011 Modification Agreement through December 2011. Def. Trial Ex. 510-B, CMI000063-64.

63. Beginning in September and continuing through December 2011, Shaw received sporadic written collection notices from CMI that consisted of formal collection notices and informal door hangers left in plain view at the McFaul Court property, demanding payment on past due amounts. Whenever he received a collection notice, Shaw contacted the telephone number on that notice. However, Shaw was repeatedly told by various CMI employees that because Shaw's account had been transferred to the Executive Response Unit, only his dedicated Homeowner Support Specialist was allowed to deal with, discuss, and handle his account issues. Shaw would then contact and advise Gabbert that he was still receiving collection notices from CMI despite the rebooking of the May 2011 Modification Agreement and the inclusion of all past due amounts into his new principal balance.

64. Sometime in the fall of 2011, Shaw applied for and was denied credit as a cosigner on his daughter's student loans through non-party Wells Fargo Bank for the 2011-12 school year.

65. Throughout the fall of 2011, Shaw repeatedly sought the identity and contact information for the owner of his residential home loan from CMI. Shaw's efforts consisted of various telephonic and written requests to Gabbert. In response to these requests, Gabbert advised Shaw of different owners at different times. Lehman Brothers through SASCO Mortgage Pass-Through Certificates was identified, non-party Aurora Loan Services was identified, and even CMI itself was identified as the owner.

66. On December 5, 2011, Shaw attempted to e-mail Gabbert requesting specific information about his loan - including copies of the original note, deed of trust, and any assignment of rights - as well as contact information for the current owner of his loan as Shaw had

17

previously received such inconsistent information about the owner from CMI. *See* Def. Trial Ex. 512-A. At that time, Shaw was informed that Gabbert was no longer employed with CMI. Shaw then forwarded the email directly to Ross, CMI's Assistant General Counsel. Def. Trial Ex. 512-A.

67. On December 8, 2011, CMI sent Shaw a letter advising him that his account had been transferred to a new Homeowner Support Specialist in the Executive Response Unit, Jennifer Butler ("Butler"). Pl. Trial Ex. 23, P00062-63. Shaw contacted Butler to outline his account history and discuss CMI's ongoing collection efforts despite his resolved loan modification. Butler informed Shaw that Shaw did not have any loan modification with CMI because he had not yet signed the July 2011 Modification Agreement. Shaw provided Butler all prior communications allegedly resolving his modification, but was then informed that CMI's Loss Mitigation and underwriting departments had confirmed that Shaw did not have a loan modification with CMI at that time, and would not have any modification with CMI unless and until he executed and submitted the July 2011 Modification Agreement.

68. Upon now being informed that he did not have a binding loan modification with CMI under the May 2011 Modification Agreement, Shaw did not make his modified mortgage payment of $3079.30 for the month of January 2012. Def. Trial Ex. 510-B, CMI000063. Since January 2012, Shaw has not made any payments on his mortgage account. *See* Def. Trial Ex. 510-B, CMI000062-63; Def. Trial Ex. 511-B.

69. On January 3, 2012, Shaw again e-mailed Ross, CMI's Assistant General Counsel, requesting information related to his loan and informing Ross that he was withholding all mortgage payments until CMI officially and finally resolved his account under the May 2011 Modification Agreement. Pl. Trial Ex. 24, P00064-65. Ross responded and informed Shaw that she had reached out to CMI Senior Management for the information Shaw had requested. *Id*.

18

70. On January 9, 2012, CMI sent Shaw a letter in response to his recent request advising him that non-party Aurora was the owner of his mortgage. Pl. Trial Ex. 25, P00066. Shaw then contacted Aurora and was informed by Aurora that it was not the owner of his mortgage and had no involvement in either his mortgage account or his loan modification since transferring the servicing rights to CMI. *See* Pl. Trial Ex. 26, P00067-69.

71. On January 20, 2012, Shaw sent Ross a formal letter outlining the information obtained from Aurora that it was not the owner of his residential home loan and requested correct ownership information, as well as all documents related to his mortgage account. Pl. Trial Ex. 26, P00067-69.

72. Approximately February 2012, Shaw's mortgage account was placed in default.

73. On February 13, 2012, CMI sent Shaw another letter again identifying the owner of his loan as non-party Aurora. Pl. Trial Ex. 31, P00099.

74. On February 23, 2012, Shaw e-mailed Butler after receiving another collection notice requesting she contact him to resolve his loan modification issues. Pl. Trial Ex. 26, P00070.

75. On March 12, 2012, Shaw received an e-mail from Butler outlining CMI's final position concerning his loan modification. Pl. Trial Ex. 27, P00068. The e-mail informed Shaw that he did not have a loan modification with CMI under the May 2011 Modification Agreement and would not have any modification of his residential loan unless and until Shaw executed the July 2011 Modification Agreement. *Id*. Butler then sent Shaw another copy of the July 2011 Modification Agreement. Pl. Trial Ex. 29, P00074-85.

76. On March 16, 2012, Shaw e-mailed Butler requesting confirmation that it was CMI's final position that the May 2011 Modification Agreement executed by both parties was not in force. Pl. Trial Ex. 30, P00086. Butler responded and confirmed that CMI was not recognizing the May 2011 Modification Agreement and was not changing its position that Shaw had to sign the July 2011 Modification Agreement. *Id*. at P00088. Further, Butler

19

advised Shaw that because he refused to sign the July 2011 Modification Agreement, his Escalated Case file with the Executive Response Unit was closed and she would no longer communicate with Shaw about his mortgage account. *Id.* at P00088; P00093. At that point, Shaw's Escalated Case with the Executive Response unit was closed and he received no further communication from Butler.

77.   Two months later, on May 30, 2012, CMI sent Shaw a letter advising him that his mortgage account had again been deemed an Escalated Case and had been transferred to a new Homeowner Support Specialist in the Executive Response Unit, Robert Orcutt ("Orcutt"). Pl. Trial Ex. 33, P00101-02. Shaw contacted Orcutt and outlined the history of his mortgage account and CMI's inconsistent positions on his loan modification. Orcutt advised Shaw that he would review Shaw's mortgage account and contact him to resolve his account issues.

78.   On June 13, 2012, Orcutt sent Shaw an e-mail outlining a proposed reinstatement of Shaw's mortgage account. Pl. Trial Ex. 35, P00104-06. The reinstatement offer provided that if Shaw paid a past due amount of $18,534.34 by June 30, 2012, CMI would reinstate Shaw's mortgage account and remove his account from default. *Id*. at P00105. However, the reinstatement offer made no mention of any loan modification or the terms of Shaw's loan going forward after reinstatement. Shaw contacted Orcutt and asked whether CMI would recognize the May 2011 Modification Agreement if he made the reinstatement payment but was not given any assurance that CMI would rebook the modification agreement or not require him to execute the July 2011 Modification Agreement documents at some time in the future. Shaw refused the reinstatement offer and did not make any reinstatement payment.

79.   On June 20, 2012, Shaw e-mailed Orcutt and requested contact information for the representative or trustee of the SASCO 2003-37A Mortgage Pass-Through Certificates, the bundled mortgage investment that included Shaw's residential home loan. Pl. Trial

Ex. 36, P00107. In response, Orcutt provided Shaw with the e-mail contact of non-party Deborah Lenhart, a representative of the bondholders of the SASCO Mortgage Pass-Through Certificates 2003-37A.

80. On June 21, 2012, Shaw sent an e-mail to Deborah Lenhart at the contact information provided by Orcutt, but the e-mail was returned as undeliverable. Pl. Trial Ex. 37, P00110-111.

81. On June 22, 2012, Shaw again contacted Orcutt to request correct contact information for Lenhart, or another representative, as the information Orcutt provided was incorrect. Pl. Trial Ex. 37, P00112-114. Orcutt informed Shaw that he did not have any other contact information for Lenhart. Pl. Trial Ex. 37, P00115.

82. On June 26, 2012, Shaw received an e-mail from CMI stating that his online account had been suspended and that he would no longer be able to receive online statements or access his online account. Pl. Trial Ex. 37, P00117.

83. In August 2012, Shaw moved out of the McFaul Court property.

84. At the end of 2012, CMI began foreclosure proceedings on the McFaul Court property. In response, Shaw placed the McFaul Court property up for sale as a short sale with non-party Pinnacle Realty.

85. On January 3, 2013, dismissed defendant NTS recorded a Notice of Default and Election to Sell Under Deed of Trust in the official records of Douglas County, Nevada (Doc. No. 0815587). Def. Trial Ex. 505-B, CMI000042-47.

86. On January 29, 2013, Shaw sent a letter to CMI objecting to the pending foreclosure of the McFaul Court property and again requesting information and documents pertaining to his residential loan. Pl. Trial Ex. 38, P00120-22.

87. On February 5, 2013, Shaw received an e-mail from attorney Joseph E. Bleeker on behalf of both CMI and dismissed defendant NTS. Pl. Trial Ex. 39, P00123-24. The e-mail informed Shaw that attorney Bleeker was in receipt of Shaw's January 29, 2013 letter and

was treating that letter as a "Qualified Written Request" pursuant to RESPA. *Id*. Attorney Bleeker then advised Shaw that CMI would respond to his letter within sixty days as required under RESPA. *Id*.

88. On February 8, 2013, Shaw received and accepted an offer on the McFaul Court property from non-parties Jeff and Cathy Knapp ("the Knapps"). Pl. Trial Ex. 40, P00125-135. The offer was a contingent short sale offer with a purchase price of $857,000.00 ("the Knapp Offer").

89. At the time of the Knapp Offer, Shaw owed approximately $900,000.00 to CMI on the residential loan and approximately $250,000.00 on the two junior liens for a total liability on the McFaul Court Property of approximately $1,150,000.

90. On February 14, 2013, Shaw forwarded to CMI, through his real estate agent, the accepted Knapp Offer. Pl. Trial Ex. 44, P00202.

91. On February 25, 2013, Shaw received a letter from CMI advising him that pursuant to the terms of the May 2011 Modification Agreement, Shaw's modified payments would be increasing from $3079.30 to $3,539.22 starting June 1, 2013. Pl. Trial Ex. 42, P00138. Shaw received this letter despite CMI repeatedly informing Shaw as early as December 2011, that he did not have a loan modification with CMI under the May 2011 Modification Agreement.

92. On March 6, 2013, Shaw received a package from Kristin Dennis, a Default Research Specialist at CMI, in response to Shaw's January 29, 2013 "Qualified Written Request." Pl. Trial Ex. 43, P00139-87. The package included copies of Shaw's account history with CMI from February 2006 through March 2013 (*Id*. at P00140-49); CMI's transaction codes for its electronic mortgage accounts (*Id*. at P00150-51); Shaw's adjustable rate note dated October 8, 2013 (*Id*. at P00152-60); the recorded first deed of trust (*Id*. at P00161-82); and the June 20, 2012 assignment of deed of trust to CMI (*Id*. at P00183-87). The letter further advised Shaw that CMI had determined that Shaw had been eligible for a

modification of his residential loan, but that his application was closed for lack of documentation because he did not sign and return the July 2011 Modification Agreement. *Id*. at P00139.

93. On or about March 19, 2013, Maria Mejia ("Mejia"), an employee in CMI's Homeowner Assistance Department, was assigned as the short sale advisor to review the Knapp Offer. Def. Trial Ex. 26.

94. On March 26, 2013, Mejia contacted Shaw's real estate agent and advised Shaw, through his real estate agent, that in order for CMI to review the Knapp Offer, Shaw had to submit several documents including: (1) a hardship letter; (2) a signed purchase agreement (as the original offer had expired in late February 2013); (3) Shaw's tax returns for the tax years 2011 and 2012; (4) all payoffs for the junior liens on the property within the last sixty days, if any; or, (5) if the junior liens still needed to be paid off, then approval letters of the short sale by each junior lien holder and releases of their junior liens; (6) the 2011 real estate tax bill for the McFaul Court property; and (7) a hazard insurance policy on the property. Def. Trial Ex. 525-A.

95. In mid-March 2013, Shaw and the Knapps signed an agreement to extend the Knapp Offer for an additional thirty (30) days.

96. On April 3, 2013, an appraisal of the McFaul Court property was conducted at the request of CMI as part of the evaluation of the Knapp Offer. Pl. Trial Ex. 49, P00283. At that time, the McFaul Court property was appraised at a value of $1,082,000.00. *Id*.

97. In mid-April 2013, after no response to the Knapp Offer by CMI, Shaw and the Knapps executed a second thirty (30) days extension on the Knapp Offer.

98. On May 6, 2013, dismissed defendant NTS recorded a Notice of Trustee's Sale on the McFaul Court property in the official records of Douglas County, Nevada (Doc. No. 0823028) setting the trustee's sale for June 5, 2013. Def. Trial Ex. 507-B, CMI000049-50.

///

99. On May 16, 2013, Shaw received an e-mail from Mejia informing him that CMI had not received all required documentation for CMI to review and consider the Knapp Offer. Shaw resubmitted most of the documentation but did not provide, at any point during the relevant time period, payoff information on the junior liens or a release of liens from the junior lien holders.

100. On May 23, 2013, CMI denied the short sale of the McFaul Court property under the Knapp Offer for lack of documentation related to the junior lien holders. However, by that point, the Knapp Offer had already expired under the terms of the second extension.

101. On June 5, 2013, dismissed defendant NTS sent Shaw a letter advising him that the trustee's sale set for June 5, 2013, was postponed until August 7, 2013. Pl. Trial Ex. 45 P00204.

102. In July 2013, Shaw and the Knapps revived the Knapp Offer to purchase the McFaul Court property as a short sale for the purchase price of $857,000.00. Shaw submitted the revived Knapp Offer to CMI. Along with the revived Knapp Offer, Shaw submitted all documents originally requested by CMI for consideration of the short sale except for releases from the junior lien holders.

103. On July 26, 2013, Shaw filed his initial complaint against CMI initiating the present action. ECF No. 1, Exhibit 1, p.8-19.

104. In mid-August 2013, after no response to the revived Knapp Offer by CMI, Shaw and the Knapps executed a thirty (30) day extension on the offer.

105. In mid-September 2013, again after no response to the revived Knapp Offer by CMI, Shaw and the Knapps executed a second thirty (30) day extension on the offer.

106. In October 2013, Shaw applied for and was denied credit as a cosigner for his son on a thirty-six (36) month lease of a Kia automobile.

107. In mid-October 2013, after still no response to the revived Knapp Offer by CMI, Shaw and the Knapps executed a third and final thirty (30) day extension on the offer.

108. In mid-November 2013, the revived Knapp Offer expired under the terms of the last extension. At that point, Shaw ended his listing agreement with non-party Pinnacle Realty and the McFaul Court property was no longer listed for sale.

109. On December 11, 2013, and in response to developments in the litigation, dismissed defendant NTS recorded a rescission of the notice of default in the official records of Douglas County, Nevada (Doc. No. 0835262). Def. Trial Ex. 508-B.

110. During the infancy of the litigation, defendant CMI was represented by Attorney Colt Dodrill ("Attorney Dodrill"). While the litigation was proceeding, Shaw contacted and met with Attorney Dodrill several times. In December 2013, after a court hearing, Attorney Dodrill and Shaw had a discussion about the possible short sale of the McFaul Court property. As part of that conversation, Attorney Dodrill advised Shaw that if he was to re-list the property for sale and accept any short sale offers, those offers should be submitted directly to Attorney Dodrill as counsel of record for CMI, rather than to CMI's Homeowner's Assistance department.

111. After the discussion with Attorney Dodrill, Shaw listed the McFaul Court property as a short sale with non-party Chase International Realty, at a listing price of $1,082,000.00, the appraised value of the property in April 2013.

112. On April 3, 2014, Shaw filed an amended complaint in this litigation. ECF No. 52.

113. On April 8, 2014, Shaw received a short sale offer on the McFaul Court property from non-parties Darin and Lisette Smith ("the Smiths") to purchase the property for $785,000.00. Pl. Trial Ex. 48A.

114. On April 11, 2014, Shaw submitted a counter-offer to the Smiths for the same purchase price which they accepted ("the first Smith Offer"). Pl. Trial Ex. 48A. The terms of the accepted counter-offer included that: (1) CMI had until April 30, 2014, to approve the short sale; (2) Katherine Barkley and Janice Shaw, the second and third junior lien holders, would be paid in full on their junior liens from the sale proceeds of the McFaul

25

Court property; (3) Shaw would receive $75,000.00 from the sale proceeds of the property; and (4) CMI would receive the remaining sale proceeds as full and final satisfaction of Shaw's residential loan and the first deed of trust. *Id*.

115. On April 14, 2014, Shaw forwarded the first Smith Offer to Attorney Dodrill and demanded a response on the offer by April 28, 2014. Pl. Trial Ex. 48A.

116. On April 30, 2014, the first Smith Offer lapsed pursuant to its terms without any action by CMI on the short sale offer.

117. On June 2, 2014, CMI denied the first Smith Offer. However, by that point, the offer had already expired under its terms more than a month earlier.

118. On July 11, 2014, Shaw received another short sale offer from the Smiths to purchase the McFaul Court property for $825,000.00 ("the second Smith Offer"). Pl. Trial Ex. 48B. The terms of the second Smith Offer included: (1) approval of the short sale by CMI within 5 business days of acceptance by Shaw; (2) Katherine Barkley and Janice Shaw, the second and third junior lien holders, would be paid in full on their junior liens from the sale proceeds; (3) Shaw would receive $75,000.00 from the sale proceeds; and (4) CMI would receive the remaining proceeds as full and final satisfaction of Shaw's residential loan and the first deed of trust. *Id*. Shaw accepted and forwarded the second Smith Offer to Attorney Andrew Bao ("Attorney Bao"), CMI's new counsel of record in the litigation. Pl. Trial Ex. 48B. Attorney Bao advised Shaw that the second Smith Offer had been submitted to CMI and that if any further information was required to consider the offer he would contact Shaw. *Id*.

119. On July 19, 2014, the second Smith Offer lapsed without any action by CMI.

120. During Shaw's attempts to sell the property in 2013 and 2014, junior lien holder Katherine Barkley did not have any conversations with Shaw regarding the various short sale offers on the McFaul Court property, had not agreed to any short sale offers on the property, and had not agreed to release her junior lien.

121. Similarly, junior lien holder Janice Shaw did not have any conversations with Shaw regarding the various short sale offers on the McFaul Court property, had not agreed to any short sale offer on the property, and had not agreed to release her junior lien.[11]

122. On August 25, 2014, Shaw filed his second amended complaint in this action. ECF No. 109. The second amended complaint is the operative complaint in this litigation.

123. By the time trial began in May 2016, Shaw's mortgage account with CMI showed a total amount due of $1,162,304.95. Pl. Trial Ex. 57. This amount was calculated as the combination of the remaining principal balance of $891,467.07; $221,350.69 in accrued interest; $43,110.45 in advanced escrow charges;[12] $186.90 in fees; and $7963.83 in past-due fees and late charges. *Id.*

124. Throughout the history of this action, Shaw sought contact information from CMI for the current owner of his residential loan. However, prior to trial in June of 2016, CMI never provided contact information for, or identified the actual current owner of Shaw's residential loan.

125. Throughout the history of this action Shaw suffered a loss of personal and business reputation as a direct consequence of CMI's conduct, collection activities, and eventual initiation of foreclosure proceedings on the McFaul Court property.

## II. Conclusions of Law

In his second amended complaint, Shaw has alleged five causes of action against CMI that are currently before the court: declaratory relief, breach of contract, breach of the implied covenants of good faith and fair dealing, interference with prospective economic advantage, and violation of

---

[11] Due to their status as junior lien holders on the McFaul Court property and beneficiaries under Shaw's obligations in their favor, the court will order that copies of this order be served upon them by Shaw's counsel.

[12] Since January 2012, CMI has advanced and paid all taxes, Homeowner's Insurance premiums, and other escrow expenses on the McFaul Court property in order to protect its security interest under the first deed of trust. Def. Trial Ex. 513-B.

the Real Estate Settlement Procedures Act. ECF No. 109. Shaw has the burden of proof on all his claims and must prove each claim by a preponderance of the evidence. *See, e.g., Cal. State Bd. of Equilization v. Renovisor's Inc.*, 282 F.3d 1233 (9th Cir. 2002) (stating the basic premise that civil claims must be proven by a preponderance of the evidence). Along with contract and tort damages, Shaw also seeks punitive damages for CMI's conduct in this action. *See* ECF No. 109. In order to be eligible for an award of punitive damages, Shaw must prove by clear and convincing evidence that CMI engaged in oppression, fraud, or malice. *See* NRS §42.005(1). The court addresses each of Shaw's remaining causes of action below.

### A. Declaratory Relief

Pursuant to Section 2201 of the Declaratory Judgment Act, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. §2201. Further "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id*. In his claim for declaratory relief, Shaw seeks a declaration from the court that the May 2011 Modification Agreement was a fully executed, valid, and binding loan modification agreement between the parties and that such agreement was, pursuant to its terms, effective May 1, 2011. *See* ECF No. 109. Shaw also seeks an order from the court declaring the parties' obligations and financial relationship under that agreement. *Id*.

The existence of a contract is a question of law. *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005); *Kabil Developments Corp. v. Mignot*, 566 P.2d 505, 577 (Or. 1977). "Formation of a valid contract requires that there be a meeting of the minds as evidenced by a manifestation of mutual intent to contract." *Ridenour v. Bank of Am., N.A.*, 23 F. Supp. 3d 1201, 1208 (D. Idaho 2014). This manifestation can take the form of an offer by one party and acceptance by the other. *Id*.; *see also Erection Co. v. W&W Steel, LLC*, 2011 U.S. Dist LEXIS 121581, at *19 (D. Or. 2011) (citing *Ken Hood Construction Co. v. Pacific Coast Construction, Inc.*, 120 P.3d 6 (Or. 2005) ("Manifestation of mutual assent ordinarily occurs through an offer or proposal by one party

followed by acceptance of the other party."); *Integrated Storage Consulting Servs. v. NetApp, Inc.*, 2013 U.S. Dist. LEXIS 107705, at *19 (N.D. Cal. 2013) ("The formation of a contract is properly shown through evidence of an offer and acceptance of definite terms."). The party asserting the existence of a contract has the burden to establish the contract's existence and its terms. *Erection Co.*, 2011 U.S. Dist. LEXIS 121581, at *20.

Here, the undisputed evidence presented at trial establishes that defendant CMI offered to modify Shaw's residential home loan in May 2011. CMI sent Shaw a letter written by CMI employee Kim Vukovich along with a copy of the May 2011 Modification Agreement. CMI's letter specifically advised Shaw that he was eligible for a loan modification as outlined by the terms of the enclosed agreement. The letter further advised Shaw that if he accepted the terms of that agreement, he should execute and submit the agreement to CMI. Shaw properly executed, by notarized signature, the May 2011 Modification Agreement and submitted the agreement to CMI on May 18, 2011, pursuant to CMI's instructions. CMI then accepted the executed May 2011 Modification Agreement by booking the terms of the modification into Shaw's electronic mortgage account on May 23, 2011. After that date, Shaw's mortgage account showed that his residential loan had been modified pursuant to the terms of the May 2011 Modification Agreement.

Additionally, on June 30, 2011, after having already booked the May 2011 Modification Agreement into Shaw's mortgage account and having accepted Shaw's first timely made modified payment under the agreement, CMI Vice-President Larry Bauman separately executed, by notarized signature, the May 2011 Modification Agreement on behalf of CMI. CMI then sent a copy of the completed May 2011 Modification Agreement, executed by both parties, to Shaw on August 9, 2011. Moreover, CMI, through its Assistant General Counsel, Dana Ross, and Homeowner Support Specialist Chris Gabbert, recognized both the validity and the legality of the May 2011 Modification Agreement in a separate letter to Shaw sent on August 23, 2011. Finally, it is undisputed that CMI accepted Shaw's timely made modified monthly payments of $3079.30 from June through December 2011.

1    The court finds that this record of activity is sufficient to establish an offer of a modification

2    by CMI and acceptance of that offer by Shaw. Such conduct establishes the formation of a contract

3    as a matter of law. *See Erection Co.*, 2011 U.S. Dist. LEXIS 121581, at *19. Further, this record of

4    activity unequivocally established "a manifestation of mutual intent" between the parties to modify

5    Shaw's residential home loan. *Ridenour*, 23 F. Supp. 3d at 1208. Therefore, the court finds that the

6    undisputed evidence in this action establishes that the parties executed a valid and binding loan

7    modification agreement known as the May 2011 Modification Agreement that defines the financial

8    relationship, duties, and obligations between Shaw and CMI, the terms of which are outlined in the

9    agreement. *See* Pl. Trial Ex. 6, P00016-20. The court makes this finding concerning the formation

10   and validity of the May 2011 Modification Agreement *nunc pro tunc*.

11   As the court has found that the May 2011 Modification Agreement is a valid contract

12   between the parties, the court finds that due to the long history of this action it is necessary to

13   define the obligations and financial relationship of the parties under the May 2011 Modification

14   Agreement and going forward from this order. In that regard, the court makes these additional

15   findings. First, the modification of Shaw's residential loan pursuant to the May 2011 Modification

16   Agreement became effective May 1, 2011. *See* Pl. Trial Ex. 6, P00017, Section 4. Second, pursuant

17   to the contract, Shaw's modified monthly payments for the first two years of the agreement were

18   set at $3,079.30, with the first payment having been due on June 1, 2011. *Id*. at P00018, Section

19   4(C). It is undisputed that Shaw timely made modified monthly payments under the May 2011

20   Modification Agreement from June through December 2011, for a total of seven (7) modified

21   payments. As addressed in depth below when analyzing Shaw's breach of contract claim, the court

22   finds that Shaw's breach of the May 2011 Modification Agreement - by withholding his modified

23   monthly mortgage payments beginning in January 2012 - was reasonable and excused because of

24   CMI's anticipatory repudiation of the May 2011 Modification Agreement in December 2011. *See*

25   *Infra* Section II(B)(ii). Accordingly, the court considers the time period from January 2012, through

26   the date of this order tolled and excluded under the agreement. The court finds that this tolling of

30

the modification agreement is equitable based on CMI's continued refusal to recognize the existence of the May 2011 Modification Agreement until the filing of the pretrial order in late 2015, four-and-a-half years after the May 2011 Modification Agreement was executed by both parties. Therefore, going forward from this order, Shaw's modified monthly payment under the May 2011 Modification Agreement remains $3,079.30 for the next seventeen (17) months, after which the monthly payment will increase pursuant to the staggered payment plan outlined in the agreement with the date the staggered payments begin commencing from the date of this order and excluding the tolled period. *See* Pl. Trial Ex. 6, P00018, Section 4(C). Similarly, the maturity date of Shaw's modified loan is extended from November 1, 2033, until approximately August 1, 2038, to account for the time tolled in this action.

Third, as specified in the May 2011 Modification Agreement, Shaw's principal balance on the loan was set at $910,110.34, $85,777.89 of which was deferred from interest charges and is due as a balloon payment at the end of Shaw's loan. *See* Pl. Trial Ex. 6, P00017-18, Section 4(B) & 4(C). Since that time, Shaw made seven modified payments of $3,079.30 under the agreement and reduced the principal balance on his residential loan. According to Shaw's April 2016 mortgage statement admitted at trial, his current remaining principal balance under his loan is $891,467.07. Pl. Trial Ex. 57. Thus, going forward, the court finds that the remaining principal balance on Shaw's loan is $891,467.07, and that Shaw's mortgage account with CMI should reflect this amount.

Fourth, the court recognizes that beginning in January 2012, CMI advanced $43,100.45 in escrow funds to Shaw's mortgage account in order to protect its security interest in the McFaul Court property during the parties' dispute and this litigation. *See* Pl. Trial Ex. 57; Def. Trial Ex. 513-B. These advanced escrow funds included quarterly property tax payments on the McFaul Court property, monthly Homeowner's Insurance premiums, and other escrow expenses for which Shaw was responsible under the terms of his original residential loan, first deed of trust, and the May 2011 Modification Agreement. CMI made all escrow payments on Shaw's account since

31

January 2012, even though Shaw's escrow account had insufficient funds to make these payments. Though it was in CMI's interest to advance these funds in order to protect its security interest in the McFaul Court property, Shaw directly benefited from CMI's conduct as no property tax liens were recorded on the McFaul Court property during the parties' dispute and his Homeowner's Insurance policy did not lapse. Accordingly, the court finds that in the interest of equity between the parties, Shaw is liable for, and CMI is entitled to recover from Shaw, the $43,100.45 in advanced escrow charges. Therefore, going forward from this order, Shaw's mortgage account should reflect that he continues to owe $43,100.45 to CMI in advanced escrow charges.

Finally, the court finds that any other fees charged by CMI against Shaw's mortgage account since January 2012, are invalid and improper. As the court has found the time between January 2012 and this order is tolled and excluded from the May 2011 Modification Agreement, all interest charges, late payment fees, and any other fees or past due amounts charged against Shaw under either his original residential loan or the May 2011 Modification Agreement are excluded. The court's finding specifically extends to and includes the $221,350.89 in accrued interest, $189.90 in fees, and $7,963.83 in past-due fees and late charges reflected on Shaw's April 2016 mortgage statement, as well as any and all other expenses and fees that have accumulated since January 2012, except for the aforementioned advanced escrow charges. *See* Pl. Trial Ex. 57. Accordingly, the court shall issue judgment on Shaw's claim for declaratory relief as outlined above.

## B.  Breach of Contract

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) a breach of that contract by the defendant; and (3) damages resulting from defendant's breach. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006); *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008). A breach of contract can occur in one of two ways. *See Nev. Power Co. v. Calpine Corp.*, 2006 U.S. Dist. LEXIS 36135, at *22 (D. Nev. 2006). The first is an actual breach of the specific terms and obligations of the contract.

*Brown*, 531 F. Supp. 2d at 1240. The second is an anticipatory breach, or repudiation, of the contract. *Nev. Power Co.*, 2006 U.S. Dist. LEXIS 36135, at *23.

In this action, Shaw has alleged both an actual breach of contract claim and an anticipatory breach of contract claim against CMI. *See* ECF No. 109; ECF No. 168. As each type of breach permits different relief and requires proof of separate and distinct elements, the court shall evaluate CMI's conduct for each type of breach separately.

### i. Actual Breach

As addressed above, the court has found that the May 2011 Modification Agreement constitutes a valid and binding contract. *Supra* Section II(A). Thus, the remaining issues for the court to determine are (1) whether CMI breached the terms of the May 2011 Modification Agreement, and (2) if there was a breach of that agreement, the damages Shaw incurred as a result of that breach, if any. *See Saini*, 434 F. Supp. 2d at 920.

Under the terms of the May 2011 Modification Agreement, CMI had a duty to correctly book and apply all of Shaw's timely made modified payments throughout the life of the modified loan. Further, CMI had a duty to keep correct records of Shaw's mortgage account so that his account was not improperly placed in default. However, in direct contravention of its obligations and duties under the May 2011 Modification Agreement, CMI unbooked the modified loan terms from Shaw's electronic mortgage account, unbooked Shaw's timely made mortgage payments for the months of June and July 2011; placed Shaw's account into default at a time that he was current on all his mortgage obligations under the express terms of the May 2011 Modification Agreement; and refused to book Shaw's timely made mortgage payment for the month of August 2011. Further, CMI sent Shaw collection notices demanding payment on over $30,000.00 in past due amounts in both July and August 2011, even though pursuant to the terms of the May 2011 Modification Agreement, all amounts that were previously past due (including the unpaid monthly payments from October 2010, through February 2011, as well as the difference between Shaw's prior monthly payments and the modified payments under the trial modification period) were specifically

included in the new principal balance of $910,110.34, and thus, there was no past due balance on Shaw's mortgage account at the time.

The court finds that CMI's undisputed conduct was a direct breach of the May 2011 Modification Agreement. Further, the court finds that CMI's unilateral actions were made without justification. As recognized by CMI, there was nothing legally deficient with the May 2011 Modification Agreement. Pl. Trial Ex. 21, P00060. Thus, CMI was not justified in unbooking both the modification's terms and Shaw's monthly payments from his electronic mortgage account simply because the May 2011 Modification Agreement lacked a payment date for the balloon payment.

As the court has found that CMI breached the May 2011 Modification Agreement, the court now turns to the issue of damages. Damages for a breach of contract claim are limited to those specifically outlined in the contract, if any, and those expectation damages sufficient to put the non-breaching party in the position it would have been in had the breach not occurred. *See, e.g., Keife v. Metro. Life Ins. Co.*, 931 F. Supp. 2d 1100, 1108-09 (D. Nev. 2013); *Midwest Precision Services, Inc. v. PTM Indus. Corp.*, 887 F.2d 1128, 1136-37 (1st Cir. 1989). Here, the May 2011 Modification Agreement does not set forth any damages for a breach of that agreement by CMI. *See* Pl. Trial Ex. 6, P00016-20. As such, Shaw's damages claim is limited to being placed in the same position under the May 2011 Modification Agreement as if the agreement had not been breached by CMI, which is a modification of his residential loan under the terms of that agreement. Shaw has already achieved this position as addressed above in the court's analysis of Shaw's declaratory relief claim. *See Supra* Section II(A). Further, it is undisputed that after CMI breached the May 2011 Modification Agreement it resolved and cured its breach of that agreement on August 15, 2011, when it rebooked the modification terms and Shaw's payments into his electronic mortgage account. *See* Def. Trial Ex. 510-B, CMI000064. At the same time, CMI removed Shaw's account from default and corrected the delinquent payment reports it had made to the various credit reporting agencies during its breach. Finally, CMI waived all late fees and other charges that it had

34

charged to Shaw's account during its breach. Thus, Shaw was already placed in the same position under the May 2011 Modification Agreement in late August 2011, as if CMI's breach had not occurred. And, Shaw has failed to prove any other consequential damages resulting from CMI's one-month breach of the May 2011 Modification Agreement. Accordingly, the court finds that Shaw is not entitled to contract damages for CMI's breach.

### ii.   Anticipatory Breach

An anticipatory breach is a breach of a contract that occurs when one party to the contract, without justification and prior to a breach by the other party, makes a statement or engages in conduct indicating that it will not or cannot substantially perform its duties under the contract. *Nev. Power Co.*, 2006 U.S. Dist. LEXIS 36135, at *28. An anticipatory breach, or repudiation, of a contract may be express or implied. *Id*. An express repudiation occurs when one party demonstrates "a definite unequivocal and absolute intent not to perform a substantial portion of the contract." *Kahle v, Kostiner,* 455 P.2d 42, 44 (Nev. 1969); *see also Stratosphere Litigation, LLC v. Grand Casinos*, 298 F.3d 1137, 1147 (9th Cir. 2002) (holding that an "[a]nticipatory repudiation occurs when a party through conduct or language makes a clear, positive and unequivocal declaration of an intent not to perform."). An implied repudiation occurs when one party acts in such a manner as to make its future performance under the contract impossible. *Covington Bros. v. Valley Plastering, Inc.*, 566 P.2d 814, 817 (Nev. 1977). If one party anticipatorily breaches the contract, a repudiation of the contract has occurred and the non-breaching party is excused from performing its obligations under the contract. *Kahle*, 455 P.2d at 44; *see also Cleverley v. Ballantyne*, 2013 U.S. Dist. LEXIS 177416, at *13 (D. Nev. 2013) (stating that an anticipatory repudiation of a contract excuses the necessity for the non-breaching party to tender performance).

The court has reviewed the evidence presented at trial and finds that CMI expressly repudiated the May 2011 Modification Agreement. The evidence in this action establishes that CMI made repeated, unambiguous, and unequivocal statements to Shaw that the May 2011 Modification Agreement was not a binding modification agreement between the parties, that Shaw did not have

any modification agreement with CMI, and that CMI would not recognize any modification agreement until Shaw executed the July 2011 Modification Agreement. CMI began making these statements to Shaw in July 2011, when Chris Gabbert, Shaw's Homeowner Support Specialist, told Shaw that CMI would only grant him a modification of his loan if he signed the July 2011 Modification Agreement. And CMI continued making similar statements about the need for Shaw to execute the July 2011 Modification Agreement even after CMI had rebooked the May 2011 Modification Agreement in August 2011. For example, Shaw's next Homeowner Support Specialist, Jennifer Butler, unequivocally advised Shaw in December 2011, and repeatedly through early 2012, that he would not have any modification of his residential loan unless he signed the July 2011 Modification Agreement and that this decision was confirmed by CMI's Loss Mitigation and underwriting departments. Although Gabbert's statement concerning the validity of the May 2011 Modification Agreement was prior to CMI curing its breach in August 2011, Butler's statements regarding the validity of the May 2011 Modification Agreement occurred in December 2011, over four months after CMI rebooked that agreement. And still no explanation was ever provided to Shaw for CMI's change in position between August 23, 2011, and early December 2011.

Based on this conduct, especially all conduct that occurred after CMI's "resolution" of Shaw's mortgage account in August 2011, the court finds that CMI expressly repudiated the May 2011 Modification Agreement. CMI's conduct constituted "a definite unequivocal and absolute intent not to perform" under the contract. *Kahle*, 455 P.2d at 44. In fact, this court cannot imagine a more unequivocal and absolute intent to not perform under the May 2011 Modification Agreement than stating that the agreement executed by the parties simply did not exist, and would not be honored. Moreover, as addressed above in Shaw's actual breach of contract claim, the court finds that CMI was not justified in its conduct simply because the May 2011 Modification Agreement did not contain a specific due date for the balloon payment. *See Supra* Section II(B)(i). Therefore, the court finds that because CMI repudiated the May 2011 Modification Agreement, Shaw was excused from his performance under that agreement beginning in January 2012. Further, the court

36

finds that Shaw was reasonable in withholding his payments after being told by Butler in December 2011, that the May 2011 Modification Agreement was not in force and that there would be no modification unless and until he executed the July 2011 Modification Agreement based on CMI's prior conduct in both breaching and repudiating the contract in July 2011, and its history of inconsistent and contradictory statements. Thus, because Shaw's non-performance under the May 2011 Modification Agreement was excused, all interest, late fees, and past due charges accrued on Shaw's loan since January 2012, are not recoverable by CMI and the court finds that these charges shall be excluded from Shaw's mortgage account.[13]

### C.  Breach of the Implied Covenants of Good Faith and Fair Dealing

Under Nevada law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and execution." *A.C. Shaw Constr. v. Washoe Cty.*, 784 P.2d 9, 9 (Nev. 1989) (quoting Restatement (Second) of Contracts §205); *see also Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007) ("It is well established that all contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair actions by one party that work to the disadvantage of the other."). "The implied covenants of good faith and fair dealing impose a burden that requires each party to a contract to 'refrain from doing anything to injure the right of the other to receive the benefits of the agreement.'" *Integrated Storage Consulting Servs.*, 2013 U.S. Dist. LEXIS 107705, at *23 (quoting *San Jose Prod. Credit Ass'n v. Old Republic Life Ins. Co.*, 723 F.2d 700, 703 (9th Cir. 1984).

To establish a claim for breach of the implied covenants of good faith and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the plaintiff's justified expectations under the contract were denied. *See Perry v.*

---

[13] The court has previously addressed the impact of CMI's anticipatory breach and how it affects the parties going forward from the court's order in the court's analysis of Shaw's declaratory relief claim. *See Supra* Section II(A).

*Jordan*, 900 P.2d 335, 338 (Nev. 1995) (citing *Hilton Hotels Corp. v. Butch Lewis Prod. Inc.*, 808 P.2d 919, 922-23 (Nev. 1991). Generally, the remedy for a breach of the implied covenants of good faith and fair dealing is limited to contractual remedies. *Mundy v. Household Fin. Corp.*, 885 F.2d 542, 544 (9th Cir. 1989); *see also Nev. Power Co.*, 2006 U.S. Dist. LEXIS 36135, at *26 ("As a contract concept, breach of duty leads to the imposition of contract damages determined by the nature of the breach and contract principles."). However, in limited circumstances, a breach of the implied covenants can give rise to tort liability. *See, e.g., State v. Sutton*, 103 P.3d 8, 19 (Nev. 2004) (holding that in special circumstances, a breach of the implied covenants of good faith and fair dealing can give rise to tort liability).

In his second amended complaint, Shaw has alleged a breach of the implied covenants of good faith and fair dealing arising from CMI's repeated refusal to accept the May 2011 Modification Agreement and continued demands for both payment on past due amounts and the execution of the July 2011 Modification Agreement. ECF No. 109. As part of this claim, Shaw has requested both contract and tort damages. *Id*. Because Shaw is requesting both contract and tort damages, the court shall evaluate Shaw's breach of the implied covenants claims separately for both a contractual and tortious breach.

### i. Contractual Breach of Implied Covenants

A contractual breach of the implied covenants of good faith and fair dealing occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp*., 808 P.2d at 923-24. "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the underlying contract and the legitimate expectations of the parties arising from the contract.'" *Integrated Storage Consulting Servs.*, 2013 U.S. Dist. LEXIS 107705, at *23 (quoting *Mundy*, 885 F.2d at 544) As such, a breach of the implied covenants of good faith and fair dealing is "limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir.

2009)

At trial, Shaw testified that under the terms of the May 2011 Modification Agreement he expected to receive a modification of his loan as outlined by the express terms of that agreement and that his mortgage account would no longer be in default as a result of the modification. However, after the parties executed the May 2011 Modification Agreement, CMI engaged in a pattern of conduct specifically designed to thwart the purpose of the contract and Shaw's reasonable expectations[14] of a modification of his residential home loan.

Initially, the court notes that some of CMI's conduct which Shaw contends establishes a breach of the implied covenants cannot support his claim as a matter of law. It is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim. *Daly v. United Healthcare Ins. Co.*, 2010 U.S. Dist. LEXIS 116048, at *4 (N.D. Cal. 2010); *see also Guz v. Betchel Nat. Inc.*, 8 P.3d 1089 (Cal. 2010) (holding that when both a breach of contract and breach of implied covenants claim are based on the same conduct, the implied covenants claim is superfluous). Thus, CMI's conduct that was a direct actual breach of the May 2011 Modification Agreement in July 2011, cannot support Shaw's implied covenants claim. As such, the court cannot, and shall not, consider CMI's conduct in unbooking the May 2011 Modification Agreement and all payments made under that agreement from Shaw's electronic mortgage account in determining whether CMI breached the implied covenants.

Nonetheless, the court finds that Shaw has proven by a preponderance of the evidence that CMI breached the implied covenants of good faith and fair dealing. First, it is undisputed that within two weeks after CMI executed the May 2011 Modification Agreement, CMI sent Shaw an entirely new modification agreement, the July 2011 Modification Agreement. This new agreement was identified by CMI employee Juan Mayorga as a "corrected" agreement that had to be signed by

---

[14] The court has reviewed the May 2011 Modification Agreement and finds that Shaw's expectations under that agreement were reasonable and justified.

1   Shaw before CMI would modify Shaw's residential loan even though it contained new material

2   terms. No explanation was ever provided to Shaw for why the new modification agreement had

3   been sent. Even Mayorga, the CMI employee who sent the July 2011 Modification Agreement, was

4   unable to inform Shaw as to why the new agreement had been drafted. Shaw was given similar

5   unresponsive answers from Chris Gabbert, who also directed Shaw to sign the new agreement if he

6   wanted a loan modification. The court finds that within the context of the confusing signals to

7   Shaw, CMI's conduct of executing a loan modification agreement and then insisting upon a new

8   agreement with materially different terms without explanation to Shaw "deliberately contravenes

9   the intention and spirit" of the properly executed and valid May 2011 Modification Agreement.

10  *Hilton Hotels Corp.*, 808 P.2d at 923-24. CMI's conduct was completely unfaithful to the purpose

11  of the May 2011 Modification Agreement which was to provide Shaw with a modification of his

12  residential home loan.[15]

13      Further, CMI engaged in a similar pattern of conduct after resolving Shaw's account in

14  August 2011. For example, Shaw timely made all modified monthly payments of $3,079.30 under

15  the May 2011 Modification Agreement through December 2011. Def. Trial Ex. 510-B,

16  CMI000063-64. However, during that same time, Shaw received written collection notices from

17  CMI demanding payment on non-existent past due amounts. Further, after his account was

18  transferred to Jennifer Butler in December 2011, CMI reversed its position on the May 2011

19  Modification Agreement and once again claimed that Shaw did not have any modification with

20  CMI because he had not yet signed the July 2011 Modification Agreement. Moreover, even after

21  being informed that CMI had previously determined that there was nothing legally deficient in the

22  May 2011 Modification Agreement, CMI's Loss Mitigation and underwriting departments

23

24          [15] The court recognizes that this aforementioned conduct occurred prior to Shaw receiving his copy of
    the fully executed May 2011 Modification Agreement and the involvement of CMI's Assistant General
25  Counsel, Dana Ross. Once Ross got involved with Shaw's mortgage issues, CMI resolved Shaw's account by
    determining that the May 2011 Modification Agreement was a valid agreement which constituted a
26  modification of Shaw's residential home loan. However, CMI's conduct prior to this resolution in August 2011
    is still relevant to Shaw's claim as it constitutes a breach of the implied covenants until that resolution.

confirmed that Shaw did not have a loan modification with CMI in December 2011, and would not have a recognized loan modification with CMI unless and until he signed the July 2011 Modification Agreement. The court finds that this post August 2011 conduct likewise "deliberately contravenes the intention and spirit" of the May 2011 Modification Agreement. *Hilton Hotel Corp.*, 808 P.2d at 923-24. Based on all of CMI's conduct in this action, the court finds that CMI breached the implied covenants of good faith and fair dealing.

As the court has found that CMI breached the implied covenants of good faith and fair dealing, the court now turns to the issue of damages. Damages under a contractual breach of the implied covenants are limited to regular contract damages. *Munly*, 885 F.2d at 544. As addressed above in the court's analysis of Shaw's actual breach of contract claim, Shaw is not entitled to contract-based damages. *See Supra* Section II(B)(i). Shaw has already been placed in the position that he would have been under the May 2011 Modification Agreement absent CMI's breach of the implied covenants. *Id*. Further, Shaw has not proven any other contract damages that could be awarded under this claim. Therefore, the court finds that Shaw is not entitled to any damages for CMI's contractual breach of the implied covenants.

### ii. Tortious Breach of Implied Covenants

Generally, a breach of the implied covenants is a contract-based claim. *Hilton Hotels Corp.*, 808 P.2d at 923. However, a breach of the implied covenants can give rise to tort liability when there is a special relationship between the contracting parties. *Id*. (stating that a tort action for an implied covenants claim requires a special element of reliance or fiduciary duty); *see also Sutton*, 103 P.3d at 19 (Tort liability for breach of the implied covenants of good faith and fair dealing is appropriate where "the party in the superior or entrusted position has engaged in grievous and perfidious misconduct."); *Max Baer Prods., Ltd. v. Riverwood Partners, LLC*, 2010 U.S. Dist. LEXIS 100325, at *14 (D. Nev. 2010) ("Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for breach of the covenant arises only 'in rare and exceptional cases' when there is a special relationship between the victim and tortfeasor."). A

41

special relationship is "characterized by elements of public interest, adhesion, and fiduciary responsibility." *Id*. Under a tortious breach, "a successful plaintiff is entitled to compensation for all of the natural and probable consequences of the wrong, including injury to the feelings from humiliation, indignity and disgrace to the person." *Sutton*, 103 P.3d at 19.

Here, the court finds that there is a special relationship between the parties sufficient to support tort liability in this action. First, the parties are in drastically different and unequal bargaining positions. *Max Baer Prods., Ltd.*, 2010 U.S. Dist. LEXIS 100325, at *9 (holding that courts allow tort liability where one party holds "vastly superior bargaining power"). CMI, as the servicer of Shaw's residential loan, held all of the bargaining power as it controlled the decision of whether to offer Shaw a loan modification, as well as the terms of that agreement. In contrast, Shaw had limited bargaining power as a financially strapped borrower seeking a modification to a loan agreement that he agreed to years earlier and for which CMI held a protected security interest. Although it was in CMI's interest to grant Shaw a modification so that Shaw would continue making payments, CMI was under no obligation to offer Shaw the May 2011 Modification Agreement or any modification agreement at all. Further, the loan modification agreement is an adhesion contract as CMI completely dictated the terms of the modification with no input by Shaw and offered that agreement to Shaw with his only option to agree to or refuse the agreement. The parties' relationship necessarily shares "a special element of reliance" sufficient for the court to find a special relationship between the parties for tort liability. *Id*. at *15. In such relationships, courts have routinely recognized that "there is a need to 'protect the weak from the insults of the stronger' that is not adequately met by ordinary contract damages." *Id*.

Further, the same conduct that supports a claim for contractual breach of the implied covenants also supports a claim for tortious breach of the implied covenants. *See Supra* Section II(C)(i). The court now turns to the issue of compensable damages under this claim. In his

complaint, Shaw seeks general tort damages pursuant to NRS §41.334.[16] *See* ECF No. 109. NRS §41.334 allows for a party to receive compensation for "loss of reputation, shame, mortification and hurt feelings." Further, under a tortious breach of the implied covenants claim, "a successful plaintiff is entitled to compensation for all of the natural and probable consequences of the wrong, including injury to the feelings from humiliation, indignity and disgrace to the person." *Sutton*, 103 P.3d at 19.

The court has reviewed all the testimony and documents admitted at trial and finds that Shaw has proven by a preponderance of the evidence that he suffered a loss of reputation, shame, mortification, indignity and disgrace as a direct result of CMI's tortious breach of the implied covenants. Shaw testified that he suffered both a loss in personal and business reputation as a proximate result of CMI's improper collection efforts after executing the May 2011 Modification Agreement. For example, Shaw testified that door hanger collection notices were placed on the door of the McFaul Court property in plain sight and were visible to his neighbors and guests to the property. Further, Shaw testified that he received various e-mails, letters, and comments from former clients and former spouses of former clients. In those various communications, Shaw was chastised and his professional skills as an attorney were questioned as he, himself, was suffering financial difficulties and facing potential foreclosure upon his personal residence. Further, Shaw's prior business partner in his legal practice used Shaw's lack of creditworthiness, as a result of CMI's pending foreclosure, in a separate legal dispute regarding the partnership's assets (which included another property) which eventually led to Shaw leaving the business and starting a new practice in Reno, Nevada. Additionally, Shaw testified that he suffered from increasing feelings of frustration, worthlessness, shame and sleeplessness in not being able to resolve or even confront his financial difficulties because of the dispute with CMI. The court finds that Shaw has proven by a

---

[16] At trial, Shaw specifically stated that he was not seeking any damages for lost income, lost rent on the McFaul Court property, or emotional distress within the context of a emotional distress claim. Thus, Shaw's damages are limited to those under NRS §41.334.

preponderance of the evidence that he suffered a loss of reputation, shame, indignity and disgrace, and other general damages as a proximate cause of CMI's conduct.

As the court has determined that Shaw has proven that he suffered general damages as a result of CMI's conduct, the next significant issue for the court is to quantify Shaw's general damages. A second issue is to determine the time frame for Shaw's damages arising from CMI's tortious conduct. At trial, Shaw presented no evidence related to any monetary figure for his general damages. In fact, the only number offered for Shaw's general damages was presented by Shaw's counsel in closing. In Shaw's closing, Shaw's counsel asked the court to award Shaw damages in the amount of $2,700 per day from the date of the execution of the May 2011 Modification Agreement by both parties through the date of trial for compensation in an amount of approximately $5,000,000.00. However, there is no testimony or evidence to support that number and the $2,700 per day figure has no relation to anything specific in this action.

The court has reviewed the documents and evidence admitted at trial and finds that an appropriate award of compensatory damages to Shaw is $500 per day during the critical time periods from May 23, 2011, through December 31, 2011, subject to tolling from August 23, 2011, to December 7, 2011, during which the May 2011 Modification Agreement was being recognized by CMI; $250 per day during the period commencing in January 2012 (when Shaw discontinued further house payments) through August 2012 (when Shaw vacated the home); and a reduced amount of $100 per day from August 2012 through the close of trial on May 5, 2016.

The court reaches the $500 per day figure based upon the reasonable amount of time spent by Shaw in the many contacts, conversations, and other uneventful communications he had with CMI concerning the properly executed and "not legally deficient" May 2011 Modification Agreement. These uneventful contacts resulted in great stress and frustration to Shaw as well as adverse effects upon Shaw's standing in the community, business reputation and credit worthiness. In support of the damages amount, the court takes judicial notice that the hourly billing rate for an experienced attorney of similar skills as Shaw in this district would have been a minimum of $300

44

per hour and there is no question that Shaw spent at least one to two hours a day, and on some days much longer, either directly responding to or communicating with CMI and its representatives, or attempting to understand CMI's inconsistent and contradictory positions concerning his mortgage account and loan modification. The court also takes into consideration that any homeowner whose home represented his or her most significant asset and also greatest debt, in this case over $900,000.00, would undergo such frustration, feelings of worthlessness and shame which should be reasonably and fairly compensable at a daily rate of $500.00 per day during this critical time period. Calculating Shaw's damages during this period at a rate of $500 per day, the court finds that Shaw is entitled to compensation in the amount of $57,000.00 ($500 per day for 114 days).

With regard to the period commencing January 2012, when Shaw stopped making his monthly payments, through August 2012, when he voluntarily vacated the McFaul Court property, the court finds that Shaw's decision to terminate payments for lack of reasonable treatment by CMI and to ultimately vacate the house eight months later and move to Reno, Nevada, is reflective in part of the continuation of Shaw's frustration, bitterness and shame imposed upon him by CMI prior to January 2012. Thus the court finds that Shaw is entitled to receive compensation for the harm he suffered during this time period. However, the court finds that Shaw's damages during this period should be adjusted to $250 per day. Calculating Shaw's damages for this period, the court finds that Shaw is entitled to compensation in the amount of $60,750.00 ($250 per day for 243 days).

Finally, with regard to the period commencing in August 2012 through the close of trial on May 5, 2016, the court finds that the tortious conduct inflicted upon Shaw prior to this time continued to cause him to suffer similarly compensable harm at an average rate of $100 per day. The reduction in this amount of compensation is reflective of the fact that Shaw was no longer paying his monthly mortgage payment and was no longer living in the McFaul Court property, although he continued to suffer from the compensable harm previously imposed upon him by CMI as previously set forth. Calculating Shaw's damages for this period, the court finds that Shaw is

entitled to compensation in the amount of $122,100.00 ($100.00 per day for 1,221 days).

### D. RESPA

The Real Estate Settlement Procedures Act, found at 12 U.S.C. §2601 *et seq.*, places certain duties and restrictions on mortgage lenders, services, and other entities that deal with residential mortgages. Pertinent to this action is Section 2605 of RESPA which requires a loan servicer, like CMI, to respond to inquires from a borrower. *See* 12 U.S.C. §2605(e). Pursuant to Section 2605(e), if a loan servicer receives a "qualified written request from the borrower" for information relating to the servicing of the borrower's loan, "the servicer shall provide a written response" appropriately responding to the borrower's request and providing any requested documentation. 12 U.S.C. §2605(e)(1)(A) & (2)(C). Similarly, pursuant to Section 2605(k), a loan servicer shall provide "the identity, address, and other relevant contact information about the owner or assignee of the loan" when requested by the borrower. 12 U.S.C. §2605(k)(1)(D). For purposes of triggering a servicer's duty under RESPA, a Qualified Written Request must (1) be a written communication, and (2) include "the name and account of the borrower," and "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. §2605(e)(1)(B)(i)-(ii).

If a servicer receives a Qualified Written Request from a borrower, then the servicer has sixty (60) days to conduct an investigation into the borrower's account, make any appropriate corrections to that account, and respond to the borrower's request "with production of the requested information or an explanation of why the information is unavailable." *Pettie v. Saxon Mortg. Servs.*, 2009 U.S. Dist. LEXIS 4149, at *7 (W.D. Wash. 2009); *see also* 12 U.S.C. §2605(e)(2). Further, the servicer shall provide the contact information for an employee who can provide assistance to the borrower. 12 U.S.C. §2605(e)(2). During the servicer's sixty day investigation and response period, a servicer is precluded from providing "information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency." 12 U.S.C. §2605(e)(3). If a servicer fails to comply with its duties

1  under RESPA, the servicer may be liable for (1) any actual damages the borrower suffered as a

2  result of the servicer's failure to comply with its duties, and/or (2) statutory damages not to exceed

3  $2,000.00. 12 U.S.C. §2605(f).

4      In his second amended complaint, Shaw has alleged that he sent several Qualified Written

5  Requests to CMI requesting contact information for the owner of his loan and copies of various

6  loan documents, but that CMI failed to respond to his requests in violation of RESPA.

7  ECF No. 109. The initial step for the court under Shaw's RESPA claim is to determine whether

8  Shaw submitted Qualified Written Requests to CMI. At trial, Shaw testified that he requested

9  information from CMI about his mortgage and the owner of his loan immediately after CMI

10  unbooked the May 2011 Modification Agreement and placed his account into default and continued

11  to request this information throughout this litigation. In particular, Shaw alleged that he made the

12  following Qualified Written Requests to CMI: (1) a July 31, 2011 e-mail request to Chris Gabbert;

13  (2) a December 5, 2011 e-mail request to Dana Ross; (3) a January 3, 2012 e-mail request to Ross;

14  (4) a January 20, 2012 formal letter to Ross; (5) a June 20, 2012 e-mail request to Robert Orcutt;

15  (6) a January 29, 2013 formal letter to CMI; and (7) multiple written requests to Gabbert, Jennifer

16  Butler, and Orcutt beginning in the fall of 2011 and continuing until Shaw initiated this litigation.

17  The court shall address each alleged Qualified Written Request below.

18      To constitute a Qualified Written Request under RESPA, a letter must include the name and

19  account of the borrower as well as a statement of reasons for believing the account is in error.

20  *Pettie*, 2009 U.S. Dist. LEXIS 4149, at *5. Initially, the court notes that Shaw's generally identified

21  written requests to Gabbert, Butler, and Orcutt beginning in the fall of 2011 are not sufficient to

22  constitute Qualified Written Requests. First, Shaw failed to provide any evidence of the dates of

23  these various communications or what information was requested or included in these

24  communications sufficient for the court to determine whether these communications met the

25  requirements of RESPA. Therefore, the court finds that Shaw has not met his burden to prove these

26  communications were Qualified Written Requests under RESPA.

As to the remaining alleged Qualified Written Requests, the court finds that Shaw did proffer copies of these communications at trial. These admitted exhibits contain sufficient information for the court to determine whether these communications meet the requirements for Qualified Written Requests under RESPA. First, the court has reviewed the July 31, 2011 e-mail request to Gabbert and finds that it does not constitute a Qualified Written Request. Although the e-mail (and all of Shaw's communications) appropriately identified Shaw and his mortgage account, the e-mail does not contain a statement for why Shaw believes that his mortgage account is in error. *See* Pl. Trial Ex. 15. Rather, the e-mail only complains of CMI's failure to previously identify the current owner of his residential loan. These statements are insufficient to trigger CMI's RESPA duties because they do not mention or discuss his default or mortgage account. *See Pettie*, 2009 U.S. Dist. LEXIS 4149, at *6 (finding that RESPA "clearly requires that a disputing party give specific 'reasons' for claiming that an account it in error."); *Banayan v. OneWest Bank F.S.B.*, 2012 U.S. Dist. LEXIS 35301, at *15 (S.D. Cal. 2012) (finding that a qualified written request must seek information "relating to the servicing of a loan."). Thus, because this e-mail did not provide any statement of reasons for Shaw's dispute with CMI regarding his mortgage account, the July 31, 2011 e-mail does not constitute a Qualified Written Request. *Pettie*, 2009 U.S. Dist. LEXIS 4149, at *7. Similarly, the court finds that Shaw's June 20, 2012 e-mail to Orcutt likewise did not constitute a Qualified Written Request. That e-mail only complains of Orcutt's failure to provide information about CMI's reinstatement offer and references several telephonic conversations. *See* Pl. Trial Ex. 36. But, like Shaw's July 31, 2011 e-mail, the June 20, 2012 e-mail does not provide any statement of the reasons for Shaw's dispute with CMI or the ongoing problems with his mortgage account. Thus, as with the July 31, 2011 e-mail to Gabbert, the court finds that Shaw's June 20, 2012 e-mail to Orcutt does not constitute a Qualified Written Request.

As for Shaw's remaining alleged Qualified Written Requests - the December 5, 2011 e-mail; January 3, 2012 e-mail; January 20, 2012 letter to Dana Ross; and the January 29, 2013 formal letter to CMI - the court finds that these document did constitute Qualified Written Requests

sufficient to trigger CMI's investigation and response duties under RESPA. In his December 5, 2011 e-mail to Ross, Shaw specifically laid out in detail the parties' dispute over his mortgage account and also requested various documents from CMI including contact information for the current owner of his loan, a copy of the original mortgage note and deed of trust, and copies of any assignment of the mortgage note and deed of trust, if any. *See* Def. Trial Ex. 512-A. Similarly, the January 3, 2012 e-mail to Ross references CMI's lack of response to the December 5, 2011 e-mail, and again details the parties' dispute including CMI's ongoing collection attempts, and requests relevant loan documents and owner information. Pl. Trial Ex. 24. Likewise, the formal letter Shaw sent to Ross on January 20, 2012, contained similar information about the parties' dispute and requested loan documents and contract information for the owner of his loan. Pl. Trial Ex. 26, P00067-69. Finally, the January 29, 2013 e-mail contained similar dispute information and demanded documentation from CMI. Such communications constitute Qualified Written Requests under RESPA. *Pettie*, 2009 U.S. Dist. LEXIS 4149, at *6; *Banayan v. OneWest Bank F.S.B.*, 2012 U.S. Dist. LEXIS 35301, at *15 (finding that a letter which contained "an extremely detailed account of various communications between the two parties" constitutes a qualified written request).

Now that the court has found that four of Shaw's written communications were Qualified Written Requests sufficient to trigger CMI's investigation and response duties under RESPA, the court must determine whether CMI's response to those requests, if any, was in accordance with its duties under RESPA. Initially, the court finds that CMI did not even respond to or acknowledge Shaw's December 5, 2011 Qualified Written Request. This lack of acknowledgment of the request is, itself, a violation of RESPA. *See* 12 U.S.C. §2605(e)(1)(A) (stating that a loan servicer "shall provide a written response acknowledging receipt of the correspondence . . . ."). CMI's failure to acknowledge receipt of Shaw's Qualified Written Request, as evidenced by the January 3, 2012 e-mail to Ross which references CMI's lack of response, was a direct violation of its duties under RESPA.

The court finds that CMI likewise violated its duties under RESPA as it relates to the January 3, 2012 Qualified Written Request. Although Dana Ross properly acknowledged this request in a January 5, 2012 e-mail to Shaw, CMI did not appropriately respond to the request after the investigation period. The evidence establishes that CMI's only response to Shaw's January 3, 2012 Qualified Written Request was a January 9, 2012 letter advising Shaw that non-party Aurora was the current owner of his residential loan and provided contact information for Aurora. Pl. Trial Ex. 25, P00066. However, at no point within sixty (60) days after receiving Shaw's request did CMI provide any of the loan documents that had been requested. CMI's failure to provide these documents to Shaw is a direct violation of RESPA. *Pettie*, 2009 U.S. Dist. LEXIS 4149, at *7.

After receiving CMI's January 9, 2012 letter identifying Aurora as the current owner of his loan, Shaw contacted Aurora at the contact information provided by CMI. Aurora advised Shaw that it was not the owner of his loan at which point Shaw again contacted CMI as outlined in his January 20, 2012 Qualified Written Request. *See* Pl. Trial Ex. 26, P00067-69. Similar to Shaw's December 3, 2011 request, CMI did not acknowledge receipt of Shaw's January 20, 2012 request. As addressed above, this failure by CMI is a violation of its duties under RESPA. 12 U.S.C. §2605(e)(1)(A). Further, the only response to Shaw's request was a February 13, 2012 letter from CMI again identifying non-party Aurora as the owner of Shaw's residential loan. Pl. Trial Ex. 31, P00099. However, by that point Shaw had already informed CMI that Aurora was not the owner of his residential loan. Thus, the information CMI provided, stating that Aurora was the current owner of his loan, was false information. CMI's failure to provide Shaw correct contact information for the owner of his loan is an express violation of RESPA. *See* 12 U.S.C. §2605(k)(1)(D) (stating that a loan servicer shall provide "the identity, address, and other relevant contact information about the owner of assignee of the loan" when requested by the borrower). Further, once again, at no point did CMI provide Shaw with any of the loan documents that he had been requesting since December 5, 2011. As addressed above, this is also a violation of RESPA. *Pettie*, 2009 U.S. Dist. LEXIS 4149, at *7.

50

Shaw's last Qualified Written Request was his January 29, 2013 Qualified Written Request. Attorney Joseph Bleeker, CMI's counsel of record at that time, acknowledged Shaw's request within the twenty day time period and stated that CMI would be responding to Shaw's request within the requisite sixty (60) days time period. *See* Pl. Trial Ex. 39, P00123-124. Further, in contrast to CMI's prior responses, or lack of responses to Shaw's requests, CMI sent Shaw a package on March 6, 2013, from Kristin Dennis, a Default Research Specialist at CMI. Pl. Trial Ex. 43, P00139-187. The court has reviewed CMI's response and finds that it properly and appropriately complied with its duties under RESPA. The package included copies of all of the documents that Shaw requested, provided a detailed explanation for CMI's actions on Shaw's mortgage account, and explained the reasons for any lacking information. As such, the court finds that CMI did not violate RESPA as it relates to Shaw's January 29, 2013 Qualified Written Request. *See, e.g., Pettie*, 2009 U.S. Dist. LEXIS 4149, at *7.

Based on the evidence presented at trial, the court has found that CMI violated RESPA on three separate occasions when dealing with Shaw's various Qualified Written Requests. A plaintiff who establishes that a servicer violated RESPA is entitled to recover "any actual damages" that the plaintiff suffered as a result of the defendant's violation and statutory damages. 12 U.S.C. §2605(f)(1)(A) & (1)(B). RESPA's "actual damages" are limited to pecuniary damages. *Zeich v. Select Portfolio Servicing, Inc.*, 2015 U.S. Dist. LEXIS 151519, at *5 (D. Or. 2015). Here, Shaw has not proven any actual damages as a result of CMI's violations of RESPA. In contrast to Shaw's claim for tortious breach of the implied covenants, under RESPA a plaintiff "cannot recover for worry, concern, or frustration." *Id.* Thus, the court finds that Shaw is not entitled to any actual damages. Instead, Shaw's damages award for CMI's violations is limited to statutory damages. Under RESPA, statutory damages may not exceed $2,000.00. 12 U.S.C. §2605(f)(1)(B). Here, the court finds that such a statutory maximum is warranted based on the repeated pattern of CMI's failure to appropriately respond to Shaw's Qualified Written Requests and the fact that Shaw was never once provided correct contact information for the owner of his residential loan. Accordingly,

the court shall enter judgment in the amount of $6,000.00 favor of Shaw and against CMI on Shaw's claims for violation of RESPA.

### E.  Intentional Interference

In Nevada, a claim for intentional interference with prospective economic advantage requires a plaintiff establish: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendants' conduct." *Fagin v. Doby George, LLC*, 2011 U.S. Dist. LEXIS 86389, at *15 (D. Nev. 2011) (citing *Wichinsky v. Mosa*, 847 P.2d 727, 729-30 (Nev. 1993)); *see also Barket v. Clarke*, 2012 U.S. Dist. LEXIS 88097 (D. Nev. 2012).

The court has reviewed the evidence submitted at trial in this matter and finds that Shaw has failed to prove his claim for intentional interference with prospective economic advantage by a preponderance of the evidence. Shaw's claim for intentional interference with prospective economic advantage relates solely to CMI's alleged failure to approve a short sale of the McFaul Court property in a timely manner, which stigmatized the property for potential buyers and caused a devaluation of the property. Although it is undisputed that Shaw had entered into four (4) separate short sale contracts on the McFaul Court property with two different parties, the Knapps and the Smiths, and that CMI had knowledge of these short sale agreements because Shaw had forwarded all four accepted short sale offers to CMI, the court finds that Shaw has not proven that CMI intended to harm Shaw by either denying the short sale offers or not responding to the short sale offers in a timely manner. At trial, Shaw only established that CMI did not respond to any of the four short sale offers in a timely manner thereby causing all four offers to expire under their terms. However, Shaw failed to provide any evidence that CMI's delay was specifically intended to cause the proposed buyers to walk away from the McFaul Court property or to cause harm to Shaw.

*///*

Further, the court finds that Shaw has not proven that CMI, as the servicer of his loan who had final approval on all short sales of the property, was not justified in its conduct. Initially, the court notes that CMI was justified in any delay in its responses to the two Knapp Offers because Shaw did not provide all necessary documents to CMI for it to properly evaluate and respond to these offers. It is undisputed that after receiving the first Knapp Offer, CMI requested various documentation from Shaw including: (1) a hardship letter; (2) a signed purchase agreement (as the original offer had expired in late February 2013); (3) Shaw's tax returns for the tax years 2011 and 2012; (4) all payoffs for the junior liens on the property within the last sixty days, if any; or, (5) if the junior liens still needed to be paid off, then approval letters of the short sale by each junior lien holder and releases of their junior liens; (6) the 2011 real estate tax bill for the McFaul Court property; and (7) a hazard insurance policy on the property. Def. Trial Ex. 525-A. Shaw submitted, and re-submitted, all requested documents except for signed releases from the junior lien holders. Shaw testified at trial that he had prepared appropriate junior lien holder releases including a consent to judgment in favor of non-party Katherine Barkley and a stipulated monetary judgment in favor of non-party Janice Shaw so that CMI could evaluate the Knapp Offers. However, both Katherine Barkley and Janice Shaw testified that they did not have any conversations with Shaw regarding the various short sale offers on the McFaul Court property, had not agreed to any short sale offers on the property, and had not agreed to release their junior liens or signed any paperwork releasing their junior liens. Further, Shaw did not provide the "judgment" documents to CMI and CMI never received any release documents signed by the junior lien holders. Accordingly, the court finds that CMI did not have any duty to approve, or even respond to, the Knapp Offers in a timely manner as Shaw failed to provide all required documents.

As to the first and second Smith Offers, the court finds that Shaw was not required to provide any releases from the junior lien holders for CMI to consider these short sale offers because under both offers, the junior lien holders were being paid in full. However, the court finds that because CMI had final authority to approve the short sales, Shaw has not established that under the

short sales he had reasonable expectations of any economic advantage under these offers. Generally, a loan servicer like CitiMortgage has no duty to approve a short sale. *See Blanford v. Suntrust Mortgage, Inc.*, 2012 U.S. Dist. LEXIS 141666, at *11 (D. Nev. 2012). Further, as the servicer of Shaw's loan, all short sale offers had to be approved by CMI, thus, even though Shaw accepted the short sale offers, he did not have any true prospective economic benefit from these offers. For example, if CMI declined both Smith Offers, then Shaw would not have received any economic benefit as a matter of law because the McFaul Court property could not be sold at an amount less than Shaw's remaining indebtedness without CMI's permission.  The court cannot now say that simply because CMI took no action on the offers, rather than deny them outright, that Shaw would have received an economic benefit. As CMI had no duty to respond,[17] a lack of response which caused the offers to lapse would constitute the same action as a denial and thus, not be actionable for an intentional interference with prospective economic advantage. As CMI has no duty to approve, act on, or even acknowledge any short sale offers Shaw received on the McFaul Court property, the court finds that Shaw has failed to prove he had a prospective economic advantage under the contracts as the determination of whether to allow the property to be sold at short sale was solely within CMI's control. Further, the testimony at trial establishes that the two Smith Offers were not reasonable short sale offers, such that the court cannot find that CMI's lack of response on these offers was designed to intentionally cause harm to Shaw or was not justified. At trial, Attorney Dodrill testified that CMI would not have approved either Smith Offer as both

---

[17] At trial, Shaw argued that CMI created a duty to respond to the Smith Offers in a timely manner by specifically requesting that Shaw re-list the McFaul Court property for sale and forward all accepted short sale offers directly to Attorney Colt Dodrill, CMI's counsel of record at that point. However, the court has reviewed the evidence submitted at trial and finds that it does not support Shaw's argument or interpretation of the December conversation that Shaw had with Attorney Dodrill. Attorney Dodrill testified that he told Shaw that if he accepted any short sale offers on the McFaul Court property that such offers should be submitted directly to him as counsel of record for CMI, but did not tell Shaw to put the property back up for sale or that he would be able to handle any short sale offers. Instead, Attorney Dodrill testified that Shaw needed to submit any offers to him directly because by that point in time, Shaw had initiated litigation against CMI and was not allowed to directly contact CMI as an adverse party. Thus, the court finds that based on this testimony, CMI did not create a specific duty to respond to the Smith Offers.

offers proposed to pay off both junior lien holders in full and give Shaw $75,000 while CMI lost

roughly $500,000 in the sale of the McFaul Court property. Attorney Dodrill further testified that

CMI had never approved a short sale in such a situation and that no short sale offer which allowed

for the borrower to receive money would be approved. Therefore, the court finds that CMI was

justified in not responding to these short sale offers as such offers were not reasonable offers for the

purchase of the property. Accordingly, based on all of the evidence presented at trial, the court

finds that Shaw has not established by a preponderance of the evidence that CMI engaged in

conduct that intentionally interfered with any prospective economic advantage. The court shall

enter judgment in favor of CMI and against Shaw on this claim.

### F. Punitive Damages

In his second amended complaint, Shaw seeks punitive damages for CMI's conduct

outlined in this action. ECF No. 109. Punitive damages are not available in contract-based claims.

*See* NRS §42.005(1) (stating that punitive damages are available in any action "for the breach of an

obligation not arising from contract"). Thus, the only claim for which punitive damages could be

awarded in this action is Shaw's claim for tortious breach of the implied covenants of good faith

and fair dealing.

Under Nevada law, in order to recover punitive damages, a plaintiff must show the

defendant acted with oppression, fraud or malice. *Pioneer Chlor Alkali Co. v. National Union Fire

Ins. Co.*, 863 F.Supp. 1237, 1250 (D. Nev. 1994). Oppression is a conscious disregard for the rights

of others constituting cruel and unjust hardship. *Id.* at 1251 (citing *Ainsworth v. Combined Ins. Co.

of America*, 763 P.2d 673, 675 (Nev. 1988)). "Conscious disregard" is defined as "the knowledge

of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to

avoid those consequences." NRS §42.001(1). Malice is conduct which is intended to injure a

person or despicable conduct which is engaged in with a conscious disregard of the rights and

safety of others. *See* NRS §42.005(1). In order to establish that a defendant's conduct constitutes

conscious disregard, the conduct must at a minimum "exceed mere recklessness or gross

negligence." *Pioneer Chlor Alkali Co.*, 863 F.Supp. at 1251; *see also Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 255 (Nev. 2008) (holding that conscious disregard requires a "culpable state of mind" and therefore "denotes conduct that, at a minimum, must exceed mere recklessness or gross negligence.").

Based upon the substantial factual history in this action, and recognizing that CMI is a large home loan servicing company, the court finds by clear and convincing evidence that CMI's business practices and its specific conduct toward Shaw constituted oppression and a conscious disregard for Shaw's rights warranting punitive damages. Given the fact that Shaw's debt of over $900,000 was for his home, that a home is most Americans greatest asset and also greatest liability and is such an integral part of any homeowner's personal well being, the court finds that a homeowner is particularly vulnerable as a result of a tortious breach of the implied covenant of good faith and fair dealing oppressively committed by a large corporate servicing company such as CMI.

Here, there was a willful and unconscionable failure to avoid needless and harmful consequences in refusing to honor or recognize the May 2011 Modification Agreement (executed by CMI's Vice-President in May 2011). CMI's conduct in recognizing then continuously disavowing that agreement - despite a resolving document from CMI's Assistant General Counsel - was made with a conscious disregard for the harm that it was causing Shaw. Further, there was a willful and deliberate failure by CMI to avoid these consequences. Accordingly, the court finds that this is an appropriate case for punitive damages.

The court has already cited many of the factors that support the court's finding within the findings of fact and tortious breach of the implied covenants section of this order and those factors find equal weight here. But, the court now highlights several factors which particularly stand out in support of punitive damages and which have not been more specifically addressed. These include CMI's lack of policies, procedures, practices and management oversight in handling mortgage account issues such as Shaw's. The lack of company policies and management oversight in this

action allowed CMI, through its Loss Mitigation, underwriting, and Executive Response Unit departments, to take the offensive position that CMI was entitled to require Shaw to abandon the fully executed May 2011 Modification Agreement in favor of the proposed July 2011 Modification Agreement despite upper management and assistant general counsel taking inconsistent and contrary positions. In essence, CMI chose to ignore its own agreement (and its own corporate counsel) because the company was aware that a financially strapped homeowner who was in default on a home loan during the post-recession economic downturn was in no position to hold CMI to the agreement it had unilaterally chosen to ignore. Given the obvious effects such a position would have upon any borrower/homeowner and the lack of any bargaining position to challenge CMI's position, it is clear that there would be dramatic and harmful consequences to a borrower which would cause feelings of utter frustration, worthlessness, and shame - shame and fear over losing a home - at the very time that the borrower was likely experiencing an insurmountable burden of debt. A non-attorney borrower would likely have caved in to CMI while an attorney like Shaw chose instead to rely upon his contract, though not without obvious compensable injury.

Beyond the above, the court also finds that there was a serious lack of practices, policies and procedures to deal with and explain the company's positions and actions to the borrower/homeowner. Here, despite repeated requests for information as to why Shaw received contradictory and inconsistent communications, CMI never provided any meaningful explanations. Moreover, CMI's responses to Shaw's requests for identification of his loan holder, including both those that qualified under RESPA and those that did not qualify, show a lack of policy and procedure to identify to a borrower/homeowner the creditor (whom CMI was representing) who owned the loan and how the creditor might be contacted. These are just a few examples of CMI's lack of centralized management policy and speak to the very core of CMI's conscious disregard of Shaw's rights. Significantly, even after going through a full trial, there has been no identification by CMI of the owner of Shaw's loan.

///

CMI's failures in this action are exacerbated by the frustration and unexplained revolving door of CMI personnel with whom Shaw was required to deal. Just during the time period from May 2011 through July 2012 when CMI effectively stopped communication with Shaw concerning his mortgage account, Shaw had dealt with two different individuals who had drafted separate modification agreements (Kim Vukovich and Juan Mayorga), three separate Homeowner Support Specialists (Chris Gabbert, Jennifer Butler, and Robert Orcutt), and CMI's Assistant General Counsel, Dana Ross, not to mention the myriad of unnamed employees Shaw contacted in 2011 through 2012. And there was commonly no meaningful explanation of why a new person, new department, or some other representative was being identified as the person with whom Shaw was now required to deal. Moreover, the evidence established that Shaw informed each new CMI representative of the history of his mortgage account and rather than investigate the matter further - an investigation readily available through Shaw's electronic mortgage account and the documents in Shaw's and CMI's possession - these representatives continued to push forward with CMI's untenable position that there was no valid and binding loan modification under the May 2011 Modification Agreement. CMI willfully ignored the harm it was causing to Shaw despite clear warning signs from Shaw that its conduct was improper.

Another failure, previously mentioned, was CMI's inexcusably delayed recognition of the May 2011 Modification Agreement. An agreement executed by its Vice-President but then rejected by some employee in the Loss Mitigation department only to be honored by CMI's own assistant general counsel and then rejected again by an employee in the Executive Response Unit without any meaningful explanation to the borrower/homeowner and without any regard for the financial burden, frustration and stress such inconsistency placed on the borrower/homeowner is strong evidence of oppression. After three plus years of litigation and a three-day bench trial, an explanation for CMI's behavior is still unknown.

Also significant to the court in finding that punitive damages are warranted in this action is the effect of CMI's actions and lack of actions concerning Shaw's credit status. While it is clear

that he was in default on his original loan, it is also clear that he cured the default through the execution of the May 2011 Modification Agreement which subsumed all past due amounts into a new principal balance, made all payments under that agreement in a timely fashion through December 2011, and yet Shaw received negative and unreliable credit reporting by CMI throughout much of this period and afterward. Although the evidence could not show the reasons for the revocation of Shaw's credit card, and the denial for Shaw's credit applications for his daughter's student loans, the rejection of the credit application for the purchase of his son's automobile, and the rejection of Shaw's own automobile purchase, it is a reasonable conclusion that CMI's negative reporting during the periods of time when the default had been cleared contributed to Shaw's credit problems, particularly when his only negative credit issues were related to his mortgage, and would have been a factor in the shame, embarrassment, stress and frustration suffered by Shaw over the relevant time period. Taking all of these factors together, they demonstrate that CMI acted with conscious disregard of Shaw's rights and support an award of punitive damages.

In Nevada, an award of punitive damages is limited to "[t]hree times the amount of compensatory damages awarded to the plaintiff if the amount of compensatory damages is $100,000 or more." NRS §42.005(a). Here, the compensatory damages under Shaw's tortious breach of the implied covenants claim is $239,850.00 and the court finds that an appropriate amount of punitive damages for the conduct outlined above is the statutory limit. Thus, trebling this amount, the court shall enter judgment in the amount of $719,550.00 in favor of Shaw and against CMI for punitive damages.

**G. Attorney's Fees**

Although not presently before the court, the court notes for the benefit of the parties that it would consider a motion for attorney's fees filed by Shaw pursuant to NRS §18.010 and 12 U.S.C. §2605(f)(3), as Shaw is the prevailing party in this action under his declaratory relief, tortious breach of the implied covenants, and RESPA claims. Therefore, the court shall grant Shaw leave to ///

file a motion for attorney's fees, if any, within twenty (20) days of entry of this order. Such motion shall comply with Local Court Rule 54-14.

IT IS THEREFORE ORDERED that the clerk of court shall enter judgment in favor of plaintiff Leslie Shaw and against defendant CitiMortgage, Inc. on Shaw's claim for declaratory relief and breach of contract in accordance with this order.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in the amount of $239,850.00 in favor of plaintiff Leslie Shaw and against defendant CitiMortgage, Inc. on plaintiff's claim for breach of the implied covenants of good faith and fair dealing.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in the amount of $6,000.00 in favor of plaintiff Leslie Shaw and against defendant CitiMortgage, Inc. on plaintiff's claims for violation of the Real Estate Settlement Procedures Act.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of defendant CitiMortgage, Inc. and against plaintiff Leslie Shaw on plaintiff's claim for intentional interference with prospective economic advantage.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in the amount of $719,550.00 in favor of plaintiff Leslie Shaw and against defendant CitiMortgage, Inc. for punitive damages.

IT IS FURTHER ORDERED that plaintiff shall serve a copy of this order upon junior lien holders Katherine Barkley and Janice Shaw within (10) days of entry of this order.

IT IS FURTHER ORDERED that plaintiff shall have twenty (20) days from entry of this order to file a motion for attorney's fees in accordance with this order, if any.

IT IS SO ORDERED.

DATED this 17th day of August, 2016.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE